Filed:  September 4, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————

No. 01-12
(CA-00-137-1)

———————

Kenneth Bernard Rouse,

                              Petitioner - Appellant,

        versus

R. C. Lee, etc.,

                              Respondent - Appellee.

———————

O R D E R

———————

      The  court  amends  its  opinion  filed  August  11,  2003,  as
follows:

      On page 28, first full paragraph, line 7 -- the phrase "an
African-American man" is changed to read "a man."

                              For the Court - By Direction


                              /s/ Patricia S. Connor
                              ————————————————
                              Clerk

**OPINION ON REHEARING EN BANC**

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

---

KENNETH BERNARD ROUSE,
    *Petitioner-Appellant,*

    v.               No. 01-12

R. C. LEE, Warden, Central Prison,
Raleigh, North Carolina,
    *Respondent-Appellee.*

---

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., Chief District Judge.
(CA-00-137-1)

Argued: April 2, 2003

Decided: August 11, 2003

Before WILKINS, Chief Judge, and WIDENER, WILKINSON,
NIEMEYER, WILLIAMS, MICHAEL, MOTZ, TRAXLER, KING,
GREGORY, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Williams wrote the majority
opinion, in which Chief Judge Wilkins and Judges Widener, Wilkin-
son, Niemeyer, Traxler, and Shedd concurred. Judge Motz wrote a
separate dissenting opinion in which Judges Michael, King, and Greg-
ory joined.

---

**COUNSEL**

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, MAHER,
WIDENHOUSE & FIALKO, Chapel Hill, North Carolina, for Appel-

lant. Clarence Joe DelForge, III, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Robert M. Hurley, CENTER FOR DEATH PENALTY LITIGATION, Durham, North Carolina, for Appellant. Roy Cooper, Attorney General, William N. Farrell, Jr., Senior Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

---

## OPINION

WILLIAMS, Circuit Judge:

A North Carolina jury convicted Kenneth Rouse of first-degree murder, robbery with a dangerous weapon, and attempted first-degree rape. Following a capital sentencing proceeding, the jury recommended the death penalty. Rouse was then sentenced to death for first-degree murder, forty years' imprisonment for armed robbery, and twenty years' imprisonment for attempted first-degree rape. More than one year after exhausting all state remedies, Rouse filed a petition for a writ of habeas corpus in the United States District Court for the Middle District of North Carolina.[1] The district court dismissed Rouse's petition as untimely pursuant to the one-year statute of limitations in the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *See* 28 U.S.C.A. § 2244(d) (West 1994 & Supp. 2003).

Rouse appeals the district court's determination that neither statutory tolling nor equitable tolling of the AEDPA limitations period operated to render his federal habeas petition timely filed. Sitting *en banc*, we hold that Rouse's federal habeas petition was filed after the expiration of the 1-year AEDPA limitations period, including statutory tolling, and that because he has not shown any extraordinary circumstances beyond his control that prevented him from complying with the statute of limitations, he is not entitled to equitable tolling. Accordingly, we affirm the district court's dismissal of Rouse's petition as untimely.

---

[1] Rouse named R.C. Lee, Warden of Central Prison, as the Respondent in his petition. For ease of reference, we refer to Respondent as "the State."

2

I.

A.

In March 1992, Rouse was convicted of first-degree murder, armed robbery, and attempted first-degree rape. The relevant facts underlying petitioner's conviction are succinctly set forth in the Supreme Court of North Carolina's opinion affirming Rouse's conviction and sentence on direct appeal.

> [Responding to a call,] [s]everal officers soon arrived at The Pantry [in Asheboro, North Carolina.] [Officer Hinshaw] heard a muffled sound coming from a storage room. He and Sergeant York, who had arrived at the scene, entered the room where they found defendant [Rouse] against a wall. Hinshaw aimed his gun at defendant, and defendant said, "I ain't got nothing, man."
>
> Defendant had blood on him, especially on the front of his shirt, his pants, his hands, his waist, his legs and his underwear. There were abrasions on his knees. His pants were unzipped but fastened at the top. His belt was hanging off. Hinshaw ordered defendant to freeze and pinned him behind the door. Defendant was then handcuffed and taken out of the room. Lieutenant Charles Bulla searched defendant in the store and found in defendant's pocket three rolls of pennies in a plastic container. Defendant was then taken away. Defendant did not resist the officers at this or any time. No odor of alcohol was found on defendant's breath.
>
> On the floor of the storage room was Hazel Colleen Broadway, lying in a pool of blood. She tried to tell Hinshaw something but soon died. Broadway was covered in blood. There were handprints on her body. She was wearing a blouse, and her pants had been pulled down to her feet. . . . [She had] a knife in [her] neck. The blade part of the knife was bent in a ninety-degree angle just below the handle.
>
> More officers soon arrived at the scene who surveyed the store and collected evidence. The store was in disarray. A

3

cigarette stand was overturned, and cigarettes were strewn about the floor. The cash register was turned sideways. Two empty rolls for pennies were on the floor. There was some other debris on the floor beside a trash can and some other penny rolls which seemed to have been knocked out of the safe. The bar stool behind the cash register had some blood on it. There were also spots of blood near the cash register. . . .

. . . [B]lood on defendant's hands, shirt and underwear was consistent with samples of blood taken from the victim. . . .

[The medical examiner] concluded that the victim died as a result of blood loss caused by a stab wound to the left neck, severing the carotid artery and jugular vein. A person could live ten to fifteen minutes after being stabbed in that location. In addition to the lethal knife wound, there were numerous other wounds to the victim including bruises, stab wounds and abrasions to her neck, chest, stomach, arms, shoulders, thighs, knee, palm, thumb, back, and elbow. Many of these were consistent with a sharp cutting instrument. Other injuries were consistent with a blunt instrument.

*State v. Rouse*, 451 S.E.2d 543, 548 (N.C. 1994).

### B.

On October 2, 1995, the United States Supreme Court denied Rouse's petition for a writ of certiorari. On April 19, 1996, Rouse filed a motion for appropriate relief (MAR) and over 100 pages of exhibits, including affidavits and interview transcripts, excerpts from the trial transcript, and letters, in the North Carolina Superior Court for Randolph County (the state MAR court). The state MAR court denied relief on the merits. *State v. Rouse*, Nos. 91-CRS-3316-17, 92-CRS-2 (N.C. Super. Ct. Aug. 2, 1996) (unpublished).[2] On October 10,

---

[2] Rouse raised in the state MAR court the same claim of juror misconduct that he attempts to raise in this federal habeas petition, alleging that

4

1996, Rouse filed an amended MAR based on intervening legislation,[3] which was also denied. At the same time, the state MAR court denied Rouse's Motion for Production of Discovery and his motion for reconsideration of the dismissal of the original MAR. The Supreme Court of North Carolina granted Rouse's petition for writ of certiorari and remanded for reconsideration of Rouse's MAR in light of two North Carolina cases interpreting the new legislation. *State v. Rouse*, 510 S.E.2d 669 (N.C. 1998) (citing *State v. Bates*, 497 S.E.2d 276 (N.C. 1998), and *State v. McHone*, 499 S.E.2d 761 (N.C. 1998)). On remand, the state MAR court again denied relief. This time, the Supreme Court of North Carolina denied the petition for writ of certiorari by order entered February 5, 1999.[4]

On February 8, 2000, Rouse filed a petition for a writ of habeas

---

a juror failed to volunteer information that his mother had been the victim of a violent crime and that the same juror falsely answered voir dire questions regarding his views on race. The state MAR court found that the juror was never asked any individual questions regarding whether any member of his family had been a victim of violent crime and that the acoustics in the trial courtroom made hearing difficult, such that the juror did not hear the questions directed to the entire group. *State v. Rouse*, Nos. 91-CRS-3316-17, 92-CRS-2 (N.C. Super. Ct. Aug. 2, 1996) (unpublished), (Supp. J.A. at 294, 297). The state MAR court also found that defense counsel was given an unlimited opportunity to voir dire the juror about his views on race, the juror answered all questions asked of him, and no evidence showed that the juror lied in answering the questions or that the juror was biased at the time of voir dire. *Id.*, (Supp. J.A. at 294-95, 306-07). Accordingly, the state MAR court denied relief.

[3] Specifically, the intervening legislation was "An Act to Expedite the Postconviction Process in North Carolina," ratified by the General Assembly on June 21, 1996. Among other things, the Act amended N.C.G.S. § 15A-1415 to add a new subsection regarding the extent of disclosure of prosecution and law enforcement investigative files required in the post-conviction process in capital cases. *See State v. Bates*, 497 S.E.2d 276 (N.C. 1998).

[4] Although the date reflected in the published opinion is February 4, 1999, *see State v. Rouse*, 531 S.E.2d 830 (N.C. 1999), the record reflects, and the State concedes, that the order was actually entered on February 5, 1999.

5

corpus in the district court. The State filed a motion to dismiss the petition as untimely. Pursuant to 28 U.S.C.A. § 636 (West 1993 & Supp. 2003), the petition was referred to a United States magistrate judge, who recommended that the district court dismiss the petition as untimely. Rouse filed detailed objections to the magistrate judge's recommendation, attaching several affidavits and a neuropsychological evaluation report. The district court "reviewed [Rouse's] objections . . . de novo and [found] they do not change the substance of the United States Magistrate Judge's rulings." (J.A. at 388.) Accordingly, the district court affirmed and adopted the magistrate judge's rulings and dismissed Rouse's petition as untimely. Rouse filed a motion to alter or amend the judgment, which the district court denied. Rouse filed a timely notice of appeal to this court.

A panel of this court reversed the district court's dismissal. *Rouse v. Lee*, 314 F.3d 698 (4th Cir.), *vacated and reh'g en banc granted*, (4th Cir. Feb. 13, 2003). Upon the State's suggestion, a majority of full-time, active circuit judges voted to rehear the case *en banc*. As Judge King granted a certificate of appealability, we proceed to address Rouse's statutory tolling and equitable tolling arguments below.

## II.

The timeliness of Rouse's petition is governed by the AEDPA. The AEDPA was signed into law on April 24, 1996, and became effective immediately. In pertinent part, it provides that:

> A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of —
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review . . . .

28 U.S.C.A. § 2244(d)(1). For prisoners, like Rouse, whose convictions became final before the AEDPA was enacted, the one-year limi-

tations period began to run on the AEDPA's effective date, and thus, they had until April 24, 1997, absent tolling, to file their federal habeas petitions. *Hernandez v. Caldwell*, 225 F.3d 435, 438-39 (4th Cir. 2000). Rouse filed his federal habeas petition on February 8, 2000. Although the AEDPA limitations period is subject to both statutory tolling and equitable tolling, *see Spencer v. Sutton*, 239 F.3d 626 (4th Cir. 2001), for the reasons discussed below, neither operated to render his petition timely filed.

## A. *STATUTORY TOLLING*

The AEDPA explicitly provides that its one-year limitations period is tolled for "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C.A. § 2244(d)(2). "[U]nder § 2244(d)(2) the entire period of state post-conviction proceedings, from initial filing to final disposition by the highest state court (whether decision on the merits, denial of certiorari, or expiration of the period of time to seek further appellate review), is tolled from the limitations period for federal habeas corpus petitioners . . . ." *Taylor v. Lee*, 186 F.3d 557, 561 (4th Cir. 1999). As there is no question that Rouse's MAR was "properly filed," and it is undisputed that Rouse's MAR was "pending" as of the AEDPA's effective date, the issue is when Rouse's MAR ceased to be pending before the highest state court. *See id.*

The district court held that Rouse's state post-conviction review was no longer pending once the Supreme Court of North Carolina denied certiorari on February 5, 1999. Accordingly, the one-year statute of limitations period ended on February 5, 2000, which being a Saturday, meant that Rouse had until February 7, 2000, to file his federal habeas petition. *See* Fed. R. Civ. P. 6(a). Because Rouse did not file his federal habeas petition until February 8, 2000, the district court concluded that the petition was untimely. Rouse argues that his MAR remained pending after February 5, 1999, and thus, that he is entitled to additional statutory tolling. We review the district court's legal conclusions de novo. *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003).

7

### 1. *North Carolina Rule of Appellate Procedure 32(b)*

Rouse argues that his MAR remained pending for twenty days after the state court denied certiorari, until February 25, 1999, because North Carolina Rule of Appellate Procedure 32(b) requires that unless "a court orders otherwise, its clerk shall enter judgment and issue the mandate of the court 20 days after the written opinion of the court has been filed with the clerk." N.C. R. App. P. 32(b). One would not expect a mandate to issue from a denial of certiorari, however, as there is no action for the lower court to take once the petition for writ of certiorari is denied. *See* Black's Law Dictionary 962 (6th ed. 1990) (providing relevant definition of "mandate" as "[a] precept or order issued upon the decision of an appeal or writ of error, directing action to be taken, or disposition to be made of case, by inferior court. Official mode of communicating judgment of appellate court to lower court, directing action to be taken or disposition to be made of cause by trial court."). Nor would one expect a judgment to be entered, as a denial of certiorari is a refusal to determine the rights and obligations of the parties. *See id.* at 841-42 (providing relevant definition of "judgment" as "[t]he final decision of the court resolving the dispute and determining the rights and obligations of the parties"); *see also Felton v. Barnett*, 912 F.2d 92, 94 (4th Cir. 1990) (holding that a "denial of . . . a writ [of certiorari from the Supreme Court of North Carolina] is not a judgment but is simply a refusal to hear the appeal"). In fact, as the clerk of the Supreme Court of North Carolina explained in an affidavit, the general practice of that court is that Rule 32(b) mandates do not issue after summary denials of certiorari. More importantly, Rouse has submitted no evidence that any mandate ever issued in his case. Thus, Rule 32(b) clearly did not apply.

### 2. *North Carolina Rule of Appellate Procedure 31(g)*

Rouse argues that his petition remained pending during the period in which he could have sought rehearing from the Supreme Court of North Carolina. While it is correct that an application for state collateral review remains pending during the time to seek further review in the state courts, "until the application has achieved final resolution through the State's post-conviction procedures," *Carey v. Saffold*, 536 U.S. 214, 220 (2002), North Carolina law does not support Rouse's

8

argument that he could have sought rehearing from the Supreme Court of North Carolina.

Under North Carolina law, a MAR is part of the original action, and thus, criminal in nature. N.C. Gen. Stat. § 15A-1411(b). Petitions for rehearing were not (and are not) available in criminal proceedings. N.C.R. App. P. 31(g). Because no rehearing was available, there was no period following the denial of certiorari during which Rouse could have sought rehearing. Rouse contends that, notwithstanding Rule 31(g), rehearing was available because the Supreme Court of North Carolina has "used its discretionary authority to reconsider denials" of such petitions. (Reply Br. at 10.) Rouse, however, did not seek such review. Moreover, the fact that North Carolina sometimes suspends or creates exceptions to its procedural rules does not mean that the state proceeding was "pending." *Cf. Carey*, 536 U.S. at 223-25 (noting that there would be no tolling of the statute of limitations during time that a prisoner might file a petition for an original writ of habeas corpus in a state supreme court where the original writ procedure is only exercised in extraordinary cases); *Allen v. Mitchell*, 276 F.3d 183, 185-86 (4th Cir. 2001) (no tolling of statute of limitations for time after appeal period ended and before untimely petition was actually under consideration by state court even though "state courts frequently suspend or create exceptions to their procedural rules, and . . . review may therefore be available even after deadlines have expired" and even though the state court did in fact consider the untimely petition for appellate review). Thus, Rule 31(g), like Rule 32(b), does not extend the pendency of Rouse's state post-conviction review.

### 3. *Federal Rule of Civil Procedure 6(e)*

Though not an argument for statutory tolling per se, Rouse argues that the "mailbox rule," Federal Rule of Civil Procedure 6(e), explicitly extends the 1-year AEDPA limitations period by three days. Rouse's argument has two fatal flaws.

First, Rule 6(e) applies only to parties.[5] During the running of the

---

[5] At the time Rouse filed his petition, Rule 6(e) stated in its entirety:

> Whenever *a party* has the right or is required to do some act or take some proceedings within a prescribed period *after the ser-*

statute of limitations, Rouse was not a party to any federal proceeding. *See Clay v. United States*, 199 F.3d 876, 880 (6th Cir. 1999) ("[B]y its plain language, Rule 6(e) provides additional time only for `a party.' . . . Rule 6(e) and the three-day extension it provides have consistently been held to be inapplicable to jurisdictional periods for commencing a proceeding in the district court.").

Second, Rule 6(e) provides a party three additional days only when that party "has the right or is required to [take some action] within a prescribed period after the service of a notice or other paper upon the party." The limitations period of the AEDPA, however, runs from "the date on which the judgment became final," 28 U.S.C.A. § 2244(d)(1)(A), not from the date on which Rouse was served with (or, in this case, merely received) notification of the final judgment. *See Geraci v. Senkowski*, 211 F.3d 6, 9 (2d Cir. 2000); *see also Hill v. Braxton*, 277 F.3d 701, 704-05 (4th Cir. 2002); *cf. Parker v. Bd. of Pub. Utils.*, 77 F.3d 1289, 1291 (10th Cir. 1996) (holding Rule 6(e) inapplicable to the ten-day period specified by Federal Rule of Civil Procedure 59(e), because that period is triggered by the entry of judgment, not by service of a notice); *Derrington-Bey v. D.C. Dep't of Corr.*, 39 F.3d 1224, 1225 (D.C. Cir. 1994) ("Mere quotation of Rule 6(e) shows why it is inapplicable to Rule 59(e) motions. The period for filing a Rule 59(e) motion does not—in the words of Rule 6(e)— begin with `service of a notice.'"); *Kyle v. Campbell Soup Co.*, 28 F.3d 928, 930 (9th Cir. 1994) ("Rule 6(e) only enlarge[s] the filing time when the period for acting runs from the *service* of a notice by mail."); 1 James W. Moore, et al., Moore's Federal Practice § 6.05[3], at 6-35 (3d ed. 1998) ("Rule 6(e) does not apply to time periods that begin with the filing in court of a judgment or order."). Thus, the mailbox rule does not extend the AEDPA limitations period.

Accordingly, Rouse's MAR was no longer pending as of February 5, 1999, and he is not entitled to statutory tolling beyond that date. We now consider whether the district court should have applied the doctrine of equitable tolling to deem the petition timely filed.

---

> *vice of a notice or other paper upon the party* and the notice or paper is served upon the party by mail, 3 days shall be added to the prescribed period.

Fed. R. Civ. P. 6(e) (2000) (emphases added).

## B.  *EQUITABLE TOLLING*

"Congress enacted AEDPA to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, ___ U.S. ___, 123 S. Ct. 1398, 1401 (2003) (internal citations and quotation marks omitted). Nevertheless, we have held that the AEDPA statute of limitations is subject to equitable tolling. *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000). As we held in *Harris*, however, rarely will circumstances warrant equitable tolling:

> [A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes. To apply equity generously would loose the rule of law to whims about the adequacy of excuses, divergent responses to claims of hardship, and subjective notions of fair accommodation. We believe, therefore, that any resort to equity must be reserved for those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.

*Id.* Principles of equitable tolling do not extend to garden variety claims of excusable neglect. *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) (equitable tolling did not apply where petitioner's lawyer was absent from the office when the EEOC notice was received, and petitioner filed within 30 days of the date he personally received notice). Equitable tolling "is appropriate when, but only when, `extraordinary circumstances beyond [the petitioner's] control prevented him from complying with the statutory time limit.'" *Spencer v. Sutton*, 239 F.3d 626, 630 (4th Cir. 2001) (quoting *Harris*, 209 F.3d at 330). Accordingly, under our existing "extraordinary circumstances" test, Rouse is only entitled to equitable tolling if he presents (1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) that prevented him from filing on time.

The district court held that although the 1-year AEDPA limitations period is subject to equitable tolling, a "mistake of counsel does not

11

serve as a ground for equitable tolling" as a matter of law. (J.A. at 328.) The court held that the circumstance that prevented Rouse from filing on time, his former counsel's "slight miscalculation by relying on Fed. R. Civ. P. 6(e)," was not an extraordinary circumstance beyond Rouse's control, and thus, that equitable tolling did not apply. (J.A. at 327-31.) The district court also found that Rouse's health during the limitations period did not warrant equitable tolling because he was not in "any way incompetent for a substantial part of the [limitations period]." (J.A. at 331.)

### 1. *Standard of Review*

Before reviewing the district court's decision, we consider the proper standard of review. We have not squarely addressed the proper standard of review of a district court's denial of equitable tolling in the habeas context.[6] In *Harris v. Hutchinson*, 209 F.3d 325 (4th Cir. 2000), the case in which we held that a habeas corpus action brought under § 2244 is subject to equitable tolling, not surprisingly, there is no mention of the standard of review. In our first habeas case applying equitable tolling post-*Harris*, *Minter v. Beck*, 230 F.3d 663 (4th Cir. 2000), we held, without any discussion of the proper standard of review, that "the district court abused its discretion" in tolling the statute of limitations. *Id.* at 667. In our next, and most recent, case considering equitable tolling in a habeas case, *Spencer v. Sutton*, 239 F.3d 626 (4th Cir. 2001), we held, again with no discussion of the standard of review, that the district court "erred" in tolling the statute. *Id.* at 631. Accordingly, we seem not to have established whether abuse of discretion or de novo review applies. *See Brecht v. Abrahamson*, 507 U.S. 619, 630-31 (1993) ("Although we have applied the *Chapman* standard in a handful of federal habeas cases, we have yet squarely to address its applicability on collateral review. . . . [S]ince we have never squarely addressed the issue, and have at most assumed the applicability of the *Chapman* standard on habeas, we are free to address the issue on the merits.").

---

[6] In the non-habeas context, we review the district court's denial of equitable tolling for an abuse of discretion. *See, e.g., Chao v. Va. Dep't of Transp.*, 291 F.3d 276, 279-80 (4th Cir. 2002).

The other circuits are divided on the proper standard of review, with some applying abuse of discretion and others applying de novo review.[7] Several circuits provide for de novo review in certain circumstances, for instance where the facts are undisputed[8] and the district court denied equitable tolling as a matter of law, and abuse of discretion review in all other circumstances.[9] We think this is the better course. Accordingly, where the relevant facts are undisputed and the district court denied equitable tolling as a matter of law, we review the district court's decision de novo. In all other circumstances, we review the denial of equitable tolling for an abuse of discretion.

---

[7] ***Compare Fierro v. Cockrell***, 294 F.3d 674, 679 (5th Cir. 2002) (applying abuse of discretion review), *cert. denied*, ___ U.S. ___, 123 S. Ct. 1621 (2003); *Delaney v. Matesanz*, 264 F.3d 7, 13 (1st Cir. 2001) (same); *and Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001) (same), *cert. denied*, 535 U.S. 973 (2002), *with Helton v. Sec'y for Dep't of Corrections*, 259 F.3d 1310, 1312 (11th Cir. 2001) (applying de novo review); *United States v. Saro*, 252 F.3d 449, 455 n. 9 (D.C. Cir. 2001) (same), *cert. denied*, 534 U.S. 1149 (2002); *Jihad v. Hvass*, 267 F.3d 803, 806 n. 3 (8th Cir. 2001) (same); *Dunlap v. United States*, 250 F.3d 1001, 1007 n. 2 (6th Cir.) (same), *cert. denied*, 534 U.S. 1057 (2001); and *Miles v. Prunty*, 187 F.3d 1104, 1105 (9th Cir. 1999) (same).

[8] Because we review this case on appeal from the district court's grant of the State's motion to dismiss, we, like the district court, must assume all facts pleaded by Rouse to be true. *Trulock v. Freeh*, 275 F.3d 391, 399 (4th Cir. 2001).

[9] ***See United States v. Saro***, 252 F.3d at 455 n.9 (examining "whether the court was `correct,' rather than whether it`abused its discretion,' because we employ de novo review when a district court holds . . . that the facts cannot justify equitable tolling as a matter of law"); *Jihad v. Hvass*, 267 F.3d at 806 n.3 (applying de novo review because district court treated equitable tolling as an issue of law); *Dunlap v. United States*, 250 F.3d at 1007 n.2 ("[W]e hold that where the facts are undisputed or the district court rules as a matter of law that equitable tolling is unavailable, we apply the de novo standard of review to a district court's refusal to apply the doctrine of equitable tolling; in all other cases, we apply the abuse of discretion standard."); *Miles v. Prunty*, 187 F.3d at 1105 ("[W]here, as here, the facts are undisputed as to the question of equitable tolling, we review de novo.").

13

2. *Whether Extraordinary Circumstances Beyond Rouse's Control Prevented Him From Filing On Time*

Turning to Rouse's arguments, he first argues that his medical condition during the limitations period is an extraordinary circumstance beyond his control that prevented him from filing on time, thus warranting equitable tolling. Because Rouse simply provides no reason why his medical condition barred him from filing his habeas petition at least one day earlier, we hold that the district court did not abuse its discretion in denying equitable tolling on this basis.[10]

Second, Rouse contends that the "gross negligence and unprofessional conduct" of his former habeas counsel in "misinterpret[ing] the statutory requirements" constitutes an extraordinary circumstance beyond his control that prevented him from filing on time. (Appellant's Br. at 25, 27-28.) The errors of Rouse's former counsel, however, were neither extraordinary nor, for purposes of our inquiry, external to Rouse's own conduct.

We review de novo the district court's denial of equitable tolling on this basis because the district court held that, as a matter of law, a "mistake of counsel does not serve as a ground for equitable tolling." (J.A. at 328.) This circuit has held that "a mistake by a party's counsel in interpreting a statute of limitations does not present the extraordinary circumstance beyond the party's control where equity should step in to give the party the benefit of his erroneous understanding." *Harris*, 209 F.3d at 331. A majority of other circuits agree. *See Merritt v. Blaine*, 326 F.3d 157, 169 (3d Cir. 2003)[11] (applying

---

[10] Abuse of discretion review applies because the district court found that, accepting all of the facts Rouse pled about his health to be true, his medical condition did not amount to an extraordinary circumstance beyond his control that prevented him from filing because he was not in "any way incompetent for a substantial part of the [limitations period]." (J.A. at 331.)

[11] Although the Third Circuit allowed equitable tolling based on attorney error in *Fahy v. Horn*, 240 F.3d 239 (3d Cir.), *cert. denied*, 534 U.S. 944 (2001), it was not based on a finding that the attorney error constituted extraordinary circumstances. Instead, the Third Circuit created a different test that applies only to capital cases. We address the Third Circuit's holding in *Fahy* below.

14

general rule that "attorney error, miscalculation, inadequate research, or other mistakes have not been found to rise to the `extraordinary' circumstances required for equitable tolling" (internal quotation marks omitted)); *Beery v. Ault*, 312 F.3d 948, 951 (8th Cir. 2002) ("Ineffective assistance of counsel generally does not warrant equitable tolling."); *Fierro v. Cockrell*, 294 F.3d 674, 683 (5th Cir. 2002) ("[C]ounsel's erroneous interpretation of the statute of limitations provision cannot, by itself, excuse the failure to file [the] habeas petition in the district court within the one-year limitations period."); *Smaldone v. Senkowski*, 273 F.3d 133, 138 (2d Cir. 2001) ("[A]ttorney error [is] inadequate to create the `extraordinary' circumstances equitable tolling requires."); *Frye v. Hickman*, 273 F.3d 1144, 1146 (9th Cir. 2001) ("We conclude that the miscalculation of the limitations period by Frye's counsel and his negligence in general do not constitute extraordinary circumstances sufficient to warrant equitable tolling."); *Taliani v. Chrans*, 189 F.3d 597, 598 (7th Cir. 1999) (holding that a lawyer's miscalculation of the limitation period was not a valid basis for equitable tolling); *Sandvik v. United States*, 177 F.3d 1269, 1272 (11th Cir. 1999) (refusing to apply equitable tolling where late filing was caused by attorney's use of ordinary mail to send petition less than a week before it was due); *Gilbert by Gilbert v. Sec. of Health & Human Servs.*, 51 F.3d 254, 257 (Fed. Cir. 1995) ("The negligence of Gilbert's attorney does not justify applying equitable tolling."). As further support for the proposition that attorney error is not an extraordinary circumstance, attorney error during habeas proceedings is not itself a ground for relief in a § 2254 proceeding. *See* 28 U.S.C.A. § 2254(i) (West Supp. 2002) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254.").

Moreover, the actions of Rouse's attorneys are attributable to Rouse, and thus, do not present "circumstances external to the party's own conduct," *Harris*, 209 F.3d at 330. Rouse's argument that the errors of his former habeas counsel are external to his conduct because he did not participate in their decisions misses the mark. Former counsel's errors are attributable to Rouse not because he participated in, ratified, or condoned their decisions, but because they were his agents, and their actions were attributable to him under standard

15

principles of agency.[12] *See Coleman v. Thompson*, 501 U.S. 722, 753-54 (1991) (explaining that attorney error, short of ineffective assistance of counsel, is, under standard principles of agency, attributable to the client); *Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[A] defendant [who] is represented by counsel whose performance is not constitutionally ineffective . . . bear[s] the risk of attorney error . . . ."); *see also Irwin v. Dep't of Veteran Affairs*, 498 U.S. 89, 92 (1990) ("Under our system of representative litigation, each party is deemed bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney." (internal quotation marks omitted)).[13]

In both *Carrier* and *Coleman*, the Supreme Court considered

---

[12] The dissent contends that Rouse's former habeas counsel were not his agents because of Rouse's limited mental ability and because of the "bewildering complexity of the habeas corpus rules." *Post* at 31 n.3. We have found no support for the proposition that, during the course of representation, lawyers are only sometimes the agents of their clients. Based on a post-indictment neuropsychological evaluation of Rouse, the state trial court found that Rouse was competent to stand trial. Rouse does not challenge this finding, and the dissent does not suggest that Rouse at some later time became incompetent. It is undisputed that Rouse did not seek to represent himself in filing his federal habeas petition. Instead, Rouse knowingly and voluntarily chose to be represented by counsel, and he bears the risk of the error of that counsel. *See Murray v. Carrier*, 477 U.S. 478, 482, 487 (1986) (habeas petitioner was bound by court-appointed attorney's failure to raise argument in state court even though attorney submitted petition without consulting petitioner and the omission was inadvertent).

[13] Rouse argues that he did not "condone, ratify, encourage, or otherwise agree" with the late filing. (J.A. at 356.) As discussed in the text, whether Rouse participated in the decision is irrelevant. Moreover, the costs of undermining the statute of limitations would be the same if the error "stem[med] from counsel's ignorance or inadvertence rather than from a deliberate decision." *Carrier*, 477 U.S. at 487. Thus, viewing the facts in the light most favorable to Rouse, assuming that he relied on counsel to timely file his petition and that he did not participate in any decision to file on February 8, he nonetheless is not entitled to equitable tolling because he bears the risk of attorney error, and such error is attributable to him.

whether an attorney's error constituted cause for a procedural default, which like equitable tolling, requires a showing that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Carrier*, 477 U.S. at 488. The Court held that "[a]ttorney ignorance or inadvertence is not `cause' because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must `bear the risk of attorney error.'" *Coleman*, 501 U.S. at 753 (quoting *Carrier*, 477 U.S. at 488). Attorney error that constitutes ineffective assistance of counsel is not attributable to the petitioner. This is so, however, "not because . . . the error is so bad that `the lawyer ceases to be an agent of the petitioner,'" but rather, because "`the Sixth Amendment itself requires that responsibility for the default be imputed to the State.'" *Id.* at 754 (quoting *Carrier*, 477 U.S. at 488). Thus, the *Coleman* Court held that attorney error during state habeas proceedings was not "cause" because "[t]here is no constitutional right to an attorney in state post-conviction proceedings . . . [and] [c]onsequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Id.* at 752.

Similarly, Rouse had no constitutional right to counsel in his federal habeas proceedings. *See Pennsylvania v. Finley*, 481 U.S. 551, 555-56 (1987) (no constitutional right to counsel beyond first appeal of right), *Hunt v. Nuth*, 57 F.3d 1327, 1340 (4th Cir. 1995) (no constitutional right to counsel during federal habeas). Rouse did have a statutory right to counsel, *see* 21 U.S.C.A. § 848(q)(4) (West 1999), but there can only be constitutional ineffective assistance of counsel where there is a constitutional right to counsel. *Coleman*, 501 U.S. at 752. In the absence of constitutional ineffective assistance of counsel, attorney error is attributable to the petitioner. *Id.* at 753. Accordingly, because Rouse's former habeas counsel's error cannot be constitutionally ineffective, that error can "fairly be attributable" to Rouse and is not "external" to his own conduct.[14] *See Coleman*, 501 U.S. at 753.

---

[14] Rouse relies heavily on *McLaughlin v. Lee*, No. 5:99-HC-436 (E.D.N.C. Oct. 17, 2000) (unpublished), in which the district court equitably tolled the one-year limitations period. In that case, McLaughlin's attorneys, as the district court emphasized, "did not make a `mistake' as to the statutory requirements. Instead, they failed to take any action at all." *Id.* at 7. The court concluded that McLaughlin's attorneys placed

17

Because Rouse has not shown that extraordinary circumstances beyond his control prevented him from timely filing his federal habeas petition, the district court did not err in holding that he is not entitled to equitable tolling under our existing "extraordinary circumstances" test applied in *Harris v. Hutchinson* and *Spencer v. Sutton*. We next consider whether we should apply a different equitable tolling test to this case.

### 3. *Whether We Should Apply A Different Test*

Rouse argues that the "significance and magnitude of the potentially barred claim is a primary justification for equitable tolling," (Appellant's Br. at 32), and the fact that he "faces a death sentence is an important part of the equitable tolling equation," (Appellant's Br. at 31). It is undisputed that neither the nature of Rouse's claims nor his sentence was a factor "beyond his control" during the limitations period or was a factor that affected his ability to meet the statutory deadline, and thus, these factors do not entitle Rouse to equitable tolling under our existing "extraordinary circumstances" test because that test requires the petitioner to present (1) extraordinary circumstances, (2) beyond his control or external to his own conduct, (3) that prevented him from filing on time. *Harris*, 209 F.3d at 330. Thus, Rouse is essentially arguing that we should apply a different equitable tolling test to his case. For the reasons set forth below, we decline to adopt an equitable tolling test that would consider a petitioner's underlying claim or sentence.

First, we see no reason why the decision as to whether a court considers the claims in an untimely petition should depend on the nature

---

him "in the extraordinary situation of believing that he had counsel when, in fact, he had counsel in name only." *Id.*

Even assuming that such utter abandonment constitutes extraordinary circumstances "external to the party's own conduct," *Harris*, 209 F.3d at 330, justifying equitable tolling, those circumstances are not present here. Despite Rouse's attempts to characterize his prior attorneys' conduct as "grossly negligent" and thus akin to such abandonment, it is simply not true that Rouse's attorneys took no action at all. They filed the petition, albeit one day late. Theirs was an ordinary legal error to which the principles of equitable tolling do not apply.

18

of the claims in the petition. Allowing consideration of the merits of time-barred claims to creep into the equitable tolling analysis lets petitioners effectively circumvent the statute of limitations because the merits of their claims will always be considered. This would enable petitioners who were in no way prevented from complying with the statute of limitations to create delay and undermine finality — two of the reasons that precipitated enactment of the AEDPA statute of limitations. As discussed below, we reject Rouse's invitation to apply equitable tolling based on a factor that had nothing to do with his failure to file on time.

Rouse claims that Justice Stevens's concurrence in *Duncan v. Walker*, 533 U.S. 167, 182 (2001) (Stevens, J., concurring), suggests that the seriousness of a potential constitutional violation would be a sound basis for equitable tolling. The concurrence, however, does not make any such suggestion. The concurrence notes that when a petition containing unexhausted claims is filed within the limitations period, "there is no reason why a district court should not retain jurisdiction over a meritorious claim and stay further proceedings pending the complete exhaustion of state remedies." *Duncan*, 533 U.S. at 182-83 (Stevens, J., concurring). The concurrence also observes that the *Duncan* majority did not "preclude[ ] a federal court from deeming the limitations period tolled [when a petition containing unexhausted claims is filed within the 1-year limitations period] as a matter of equity." *Id.* at 183 (internal citations omitted). In other words, the concurrence suggests that equitable tolling might be appropriate based on the filing of a petition, albeit an improper petition containing unexhausted claims, within the time period, not that the nature of the claims is a sound basis for equitable tolling. Rouse did not file any federal habeas petition within the limitations period, let alone one containing exhausted and unexhausted claims, so the situation contemplated by the *Duncan* concurrence is not before us.

Rouse also relies on *Baskin v. United States*, 998 F. Supp. 188, 189-90 (D. Conn. 1998), but it does not provide any more support than does the *Duncan* concurrence. In *Baskin*, the petitioner alleged that his federal habeas petition was late because his trial counsel never informed him that the United States Supreme Court denied his petition for certiorari. The court held that "[i]t would be grossly inequitable to bar petitioner's ineffective assistance of counsel claim on

the basis that counsel's error permitted the statute of limitations to run." *Id.* at 190. This is not a suggestion that the merits of the underlying claim is a reason to grant equitable tolling. Instead, the court recognized that, as we discussed above, if trial counsel's error constituted constitutional ineffective assistance of counsel, then counsel's error is not attributable to the petitioner pursuant to *Coleman* and *Carrier*. For the reasons discussed in Section B.2, however, Rouse's former habeas counsel's error is attributable to Rouse.

Finally, my dissenting colleagues rely on *Lonchar v. Thomas*, 517 U.S. 314, 320 (1996), to contend that "the strength of the claims in a habeas petition *must* inform a court's decision to exercise its equitable power to toll limitations."[15] *Post* at 33. But *Lonchar*, a pre-AEDPA case, has nothing at all to do with equitable tolling, and it certainly does not hold that we should consider the strength of the claims in a habeas petition when deciding whether equitable tolling is appropriate.[16] To the extent that *Lonchar* informs the analysis, however, it reinforces our belief that we should follow our equitable toll-

---

[15] It seems curiously circular to say, as it appears my dissenting colleagues would, that we consider the merits in deciding whether we can consider the merits. We note, however, that even if we were to agree that the strength of the claims in a petition should affect a court's decision to invoke equitable tolling, Rouse's claims, evaluated in light of the deference that we statutorily are required to give to state court factual findings and conclusions of law, are far from strong. *See* 28 U.S.C.A. §§ 2254(d), (e)(1); *see also Rouse v. Lee*, 314 F.3d 698, 719-20 (4th Cir. 2003) (vacated panel opinion) (Williams, J., dissenting) (discussing factual findings and conclusions of law of the state MAR court). The dissent concludes otherwise by relying solely on Rouse's allegations, giving short shrift to the factual findings of the state MAR court and the deference federal habeas courts owe to state courts. As noted *supra* at 4 and note 2, the state MAR court rejected Rouse's juror misconduct claim after considering over 100 pages of evidence. Contrary to the dissent's assertion, *post* at 32-33 n.4, the state MAR court's factual findings were based on the evidence that Rouse and the State presented to the court and judicial notice regarding the acoustics in the trial courtroom. These factual findings are presumed correct. 28 U.S.C.A. § 2254(e)(1).

[16] Contrary to the dissent's assertion, *post* at 33, *Spencer v. Sutton* does not suggest that the strength of the claim in a habeas petition affects the decision whether to equitably toll the limitations period.

20

ing decisions that restrict equitable tolling to narrow circumstances not present in this case. *See Cantu-Tzin v. Johnson*, 162 F.3d 295, 298 (5th Cir. 1998) ("[C]onfirmation that a statutory limitations period should be enforced appears in the Supreme Court's . . . decision in *Lonchar v. Thomas* . . . .").

At issue in *Lonchar* was whether "the Court of Appeals properly dismiss[ed] [a] first habeas petition for special ad hoc `equitable' reasons not encompassed within the framework of [Habeas Corpus] Rule 9." *Lonchar*, 517 U.S. at 322. In concluding that the court of appeals had erred, the Supreme Court stressed that "Congress and the framers of the Rule" undertook a balancing of interests, "*which courts may not undermine through the exercise of background equitable powers*." *Id.* at 327 (emphasis added); *see Cantu-Tzin*, 162 F.3d at 298 ("The tenor of the majority discussion in *Lonchar* is that federal courts should not intervene to create equitable reasons for denying stays of execution when federal law and the habeas rules have prescribed principles applicable to the complex mix of equities in capital cases."). Here, no less, by enacting the AEDPA, Congress has balanced the competing interests — a balance embodied in section 2244(d), which provides a 1-year limitation period and explicitly specifies conditions under which that period should be tolled. We may not amend that statute "through . . . ad hoc judicial exception." *Lonchar*, 517 U.S. at 328. While we have already held that equitable tolling applies to the AEDPA when extraordinary circumstances beyond the petitioner's control prevent him from filing a timely petition, *see Harris*, 209 F.3d at 329-30, we must refrain from ad hoc alteration of the statutory command. The doctrine of equitable tolling is not a license to suspend enactments of Congress whenever we happen to believe that enforcement of a limitations period would create a hardship. *See id.* (cautioning that "any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes").[17]

---

[17] As the dissent points out, the Federal Rules Governing Section 2254 Cases support the conclusion that the merits of the underlying claim are not part of the equitable tolling analysis. *See post* at 28-29 n.1. Because the State does not file a copy of the decision of the state post-conviction

21

My dissenting colleagues correctly point out that Rouse's petition was filed only one day late and argue that "the most minor procedural default imaginable" should not bar federal habeas review in light of what they consider to be his "facially strong constitutional claim." *Post* at 34. We recognize that "[a]t the margins, all statutes of limitations and filing deadlines appear arbitrary." *Lookingbill v. Cockrell*, 293 F.3d 256, 264-65 (5th Cir. 2002) (declining to equitably toll when the petition was only four days late); *cf. Spencer*, 239 F.3d at 631 (declining to equitably toll when the petition was only five days late). Failure to adhere to the AEDPA's precise filing deadlines, however, even "by only a few days," "would make navigating [the] AEDPA's timetable impossible. Such laxity would reduce predictability and would prevent us from treating the similarly situated equally." *Lookingbill*, 293 F.3d at 265. Accordingly, we look not to the length of the delay, but to the reasons for delay in determining whether equitable tolling is appropriate.

Turning to the argument that the nature of Rouse's sentence should affect the equitable tolling analysis, both Rouse and the dissent argue that we should follow the Third Circuit's decision in *Fahy v. Horn*, 240 F.3d 239 (3d Cir. 2001), and allow "`less than "extraordinary" circumstances to trigger equitable tolling'" in capital cases because "death is different." (Appellant's Br. at 31 (quoting *Fahy*, 240 F.3d at 245)); *post* at 38-39. Neither Supreme Court precedent nor precedent from this court supports applying a different test to capital cases on collateral review.

Although Rouse's underlying claims pertain to his trial, we deal here only with the application of the AEDPA limitations period. While it is undeniable that the Supreme Court has treated death differ-

---

court in the federal district court until it files its answer, Fed. R. Governing Section 2254 Cases 5, a motion to dismiss a petition as untimely will often be before the federal district court before the state post-conviction decision is filed. Thus, the Rules contemplate that the federal court may rule without considering the merits because the court certainly could not consider the merits of the underlying claims without the benefit of the state post-conviction decision, to which federal habeas courts owe considerable deference. 28 U.S.C.A. §§ 2254(d), (e)(1).

22

ently, any distinctions between the procedures required in capital and noncapital cases "are primarily relevant to trial," and the Supreme Court "has generally rejected attempts to expand any [such] distinctions further."[18] *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 281 (1998) (plurality opinion); *see, e.g.*, *Herrera v. Collins*, 506 U.S. 390, 405 (1993); *Murray v. Giarratano*, 492 U.S. 1, 8-10 (1989) (plurality opinion); *Satterwhite v. Texas*, 486 U.S. 249, 256-58 (1988); *Smith v. Murray*, 477 U.S. 527, 538-39 (1986). The Court has, for example, refused to create a special death penalty exception to the traditional harmless error standard of appellate review set forth in *Chapman v. California*, 386 U.S. 18 (1967). *See Satterwhite*, 486 U.S. at 256-58. *Satterwhite* illustrates that even though capital defendants might be entitled to heightened procedural safeguards at trial, the standard of appellate review does not change solely because a capital sentence has been imposed. While recognizing that capital defendants have a constitutional right to consult with counsel prior to submitting to a psychiatric examination that would determine future dangerousness, *see id.* at 254, when addressing a violation of this constitutional

---

[18] Similarly, the cases cited by the dissent, *post* at 35, for the proposition that "death is different" involve heightened procedures necessary at trial or sentencing. *See Ring v. Arizona*, ___ U.S. ___, 122 S. Ct. 2428, 2441-42 (2002) (declining to "differentiate capital cases from all others" and holding that "facts increasing punishment beyond the maximum authorized by a guilty verdict standing alone . . . must be found by a jury"); *Thompson v. Oklahoma*, 487 U.S. 815, 877-78 (1988) (Scalia, J., dissenting) (considering whether capital punishment of fifteen year old violates Eighth Amendment); *Caldwell v. Mississippi*, 472 U.S. 320, 323 (1985) (holding that capital sentence is not valid "when the sentencing jury is led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case"); *Gardner v. Florida*, 430 U.S. 349, 358 (1977) (holding that the judge cannot "impose the death sentence on the basis of confidential information which is not disclosed to the defendant or his counsel"); *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion) (holding that mandatory death sentences for first-degree murder are unconstitutional); *Bracy v. Schomig*, 286 F.3d 406, 415 (7th Cir. 2002) (en banc) (evaluating judge's actions during sentencing phase of trial), *cert. denied*, ___ U.S. ___, 123 S. Ct. 169 (2002); *see also Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (holding that individualized sentencing is not required for non-capital cases).

right, the Court held that traditional harmless error analysis applied even in the capital context. *See id.* at 258. That is, death made a difference in terms of what procedures the state had to employ at trial but not in the appellate standard of review.

In addition, the Supreme Court has repeatedly declined to treat death differently in the post-conviction context. In *Smith v. Murray*, a capital case, the Court specifically rejected the claim that the principles governing procedural default "apply differently depending on the nature of the penalty a State imposes for the violation of its criminal laws." *Smith*, 477 U.S. at 538. Similarly, in *Giarratano*, the Court concluded that "the rule of *Pennsylvania v. Finley* [that there is no constitutional right to counsel in state post-conviction proceedings] should apply no differently in capital cases than in noncapital cases." *Giarratano*, 492 U.S. at 10 (plurality opinion); *see also Herrera*, 506 U.S. at 405 (holding that claims of actual innocence are not grounds for habeas relief even in a capital case and noting that "we have `refused to hold that the fact that a death sentence has been imposed requires a different standard of review on federal habeas corpus'" (quoting *Giarratano*, 492 U.S. at 9 (plurality opinion))); *cf. Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (applying, in a capital case, the general requirement of cause and prejudice to overcome a state procedural bar).

The cases cited by my dissenting colleagues are not to the contrary. For example, quoting *California v. Ramos*, 463 U.S. 992, 998-99 (1983), the dissent states that "the Supreme Court has emphasized [that] `the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination,' that is, `the *procedure* by which the State imposes the death sentence,' to `ensur[e] that the death penalty is not meted out arbitrarily or capriciously.'" *Post* at 36. As this quotation reveals, "the Court's principal concern has been more with the *procedure* by which the State imposes the sentence." *Ramos*, 463 U.S. at 999. This fits nicely with the decisions quoted above, which acknowledge that heightened procedural safeguards may be necessary at trial.

Moreover, those cases cited by the dissent that discuss *appellate* decision-making do not support the dissent's position that, in capital cases, the doctrine of equitable tolling allows courts to rewrite the

24

AEDPA statute of limitations. For example, my dissenting colleagues contend that "the Supreme Court itself has, `in the interests of justice,' been willing to overlook requirements that it would ordinarily impose in non-capital cases." *Post* at 36 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 117 n. * (1982) (O'Connor, J., concurring)). Justice O'Connor's discussion, however, as the dissent notes, pertained to the question of whether an argument had been waived below, not the far more serious matter of whether to apply a narrow equitable exception to a statutory limitations period enacted by Congress and absolute by its terms.[19]

The dissent also quotes Justice Scalia's concurrence in *Dobbs v. Zant*, 506 U.S. 357, 360 (1993): "I am willing to make an exception from that [previously stated `general' internal] rule in capital cases — but only where there is a realistic likelihood that the `technical error' affected the conviction *or the sentence*." *Post* at 36 (emphasis and alterations supplied by dissent). The "previously stated `general' internal" rule to which the quoted passage refers, however, is simply the Court's internal presumption against granting certiorari in cases that have little importance beyond the parties involved; Justice Scalia certainly did not say that exceptions should be made to the equitable tolling analysis on habeas review of capital cases.

In fact, relaxing the statute of limitations in capital cases would contradict one of the main purposes of the AEDPA which was "to reduce delays in the execution of state and federal criminal sentences, *particularly capital cases*." *Woodford v. Garceau*, ___ U.S. ___, 123 S. Ct. at 1401 (emphasis added); see also *Carey v. Saffold*, 536 U.S. 214, 226 (2002) (noting the AEDPA's "statutory purpose of encour-

---

[19] The dissent also suggests that the majority opinion in *Eddings v. Oklahoma* stands for the proposition that "the Court has treated the requirement that an argument be raised below . . . as merely `techni-cal[ ].'" *Post* at 36 (citing *Eddings* majority opinion). The majority opin-ion in *Eddings* stands for no such proposition. The Court did not, as is implied by the dissent, waive the requirement that arguments be pre-sented below in order to preserve appellate review. Instead, the Court found "that in his petition to the Court of Criminal Appeals for a rehear-ing, Eddings specifically presented the issue and at some considerable length." *Eddings v. Oklahoma*, 455 U.S. 104, 113 n.9 (1982).

25

aging prompt filings in federal court in order to protect the federal system from being forced to hear stale claims"). An equitable tolling analysis that encouraged judicial subversion of Congress's limitation on federal habeas and devolved into a wide ranging inquiry into the proceedings of the state trial court and habeas court would undermine the "principles of comity, finality, and federalism" that animate the AEDPA. *See Williams v. Taylor*, 529 U.S. 420, 436 (2000).

Because we deal today with the district court's decision on habeas review not to toll the AEDPA limitations period, rather than with *state* capital procedures at trial or sentencing, we hold that Rouse's death sentence does not change the test we apply to determine if equitable tolling is warranted.[20]

## III.

The delay involved in filing this petition may seem small but the principles at issue are large. My dissenting colleagues would abandon our existing extraordinary circumstances test in favor of a wide-ranging inquiry into a variety of factors other than the reasons why the petitioner did not comply with the statutory time limitation. This approach would make application of the statute of limitations to an individual case unpredictable and indeterminate and essentially would disregard the balance that Congress has struck between the need for habeas review and the need for comity, finality, and federalism. In short, we are being asked here not to follow the law, but essentially to recreate it. For these reasons, we held in *Harris v. Hutchinson*, that

---

[20] Other courts have also denied equitable tolling in capital cases, applying the same test as they apply in non-capital cases. *See, e.g.*, *Fierro*, 294 F.3d at 682-84 (denying equitable tolling based on "mistaken assumption" regarding statute of limitations); *Lookingbill v. Cockrell*, 293 F.3d 256, 263-65 (5th Cir. 2002) (denying equitable tolling for "garden variety claim[s] of excusable neglect"), *cert. denied*, ___ U.S. ___, 123 S. Ct. 878 (2003); *Kreutzer v. Bowersox*, 231 F.3d 460, 463 (8th Cir. 2000) (holding that "counsel's confusion about the applicable statute of limitations does not warrant equitable tolling"); *Cantu-Tzin v. Johnson*, 162 F.3d 295, 299-300 (5th Cir. 1998) (concluding that equitable tolling of the AEDPA limitations period was not available to a petitioner who was responsible for missing the deadline).

26

"any invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent, lest circumstances of individualized hardship supplant the rules of clearly drafted statutes." *Harris*, 209 F.3d at 330. Because Rouse's attorneys could have filed his petition on time, but simply failed to do so, he is not entitled to equitable tolling.

For the foregoing reasons, we hold that Rouse's state post-conviction review was no longer pending as of February 5, 1999, when the Supreme Court of North Carolina denied his petition for certiorari, and thus, that he is not entitled to statutory tolling beyond that date. Because he has not shown any extraordinary circumstances beyond his control that prevented him from complying with the AEDPA statute of limitations, he is not entitled to equitable tolling. Accordingly, Rouse's petition was filed after the expiration of the limitations period, and we affirm the district court's dismissal of Rouse's petition as untimely.

*AFFIRMED*

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

In this federal habeas petition, his first, Kenneth Bernard Rouse, a prisoner under sentence of death, seeks relief on the basis of evidence that a juror who voted to convict and execute him deliberately concealed contempt for all African-Americans and a particular bias against Rouse in order to serve on Rouse's jury. The district court held that Rouse's former lawyers filed his habeas petition one day late and that Rouse presented no grounds for equitably tolling the limitations period and so dismissed Rouse's habeas petition as untimely. The majority affirms. Thus, Rouse faces his death, denied all federal habeas review and without ever having received a hearing in any court on his disturbing evidence of juror bias. With respect, I must dissent. If equity has any place in our habeas jurisprudence, and the Supreme Court has long "adhered to the principle that habeas corpus is, at its core, an equitable remedy," *Schlup v. Delo*, 513 U.S. 298, 319 (1995), then the exceptional circumstances presented in this case demand tolling.

27

## I.

Eleven years ago, a North Carolina all-white jury convicted Rouse, an African-American, of the robbery, attempted rape, and brutal murder of Hazel Colleen Broadway, a sixty-three-year-old white woman. On the jury's recommendation, the state judge sentenced Rouse to death. After his appeal was denied, Rouse discovered new evidence that the mother of one member of the jury had been robbed, raped, and murdered by a man who was later executed for the crimes. When all prospective jurors were asked for such information at voir dire, the victim's son had remained silent.

After serving on Rouse's jury, this juror reportedly stated that he had intentionally concealed his mother's tragic death and carefully crafted his other responses to voir dire questions, because he wanted to be on the jury that judged Rouse. Moreover, this juror assertedly expressed intense racial prejudice against African Americans, calling them "niggers" and opining that African Americans care less about life than white people do and that African-American men rape white women in order to brag to their friends.

Because the juror did not reveal his own family's tragedy or his virulent racial prejudice, Rouse had no opportunity to object to the juror or challenge his ability to judge and sentence Rouse impartially. Based on this newly discovered evidence, Rouse asserted a jury bias claim on collateral attack in state court, which twice denied his claim without a hearing. Rouse then filed the petition giving rise to this appeal — his first federal habeas petition — but he filed it one day after the Antiterrorism and Effective Death Penalty Act's (AEDPA) limitations period expired. The district court dismissed the petition as untimely, again without a hearing.

As his appeal reaches us, therefore, Rouse has *never* received, even post-sentence, any opportunity to explore at a hearing the evidence he proffers of appalling bias on the part of one of his jurors. Of course, a federal court might conclude that this claim lacks merit; but at present, no federal court has ever examined the claim.[1]

———————————————————————————————

[1] Indeed, the district court could not have examined the claim in any depth, because it rejected Rouse's petition at such an early stage that the

## II.

Although Rouse's former lawyers relied on a facially applicable state procedural rule and federal decisions interpreting Federal Rule of Civil Procedure 6(e) in calculating the filing deadline for his federal habeas petition, they erred and filed that petition late. But the petition was only one day late.[2] Given this and the other "extraordinary and unique circumstances in his case," Rouse asks us to invoke our equitable power to toll the statute of limitations by one day.

The majority, however, concludes that Rouse has failed to meet the requirements necessary for a court to equitably toll the statute of limitations. According to the majority, a petitioner in Rouse's position must demonstrate "(1) extraordinary circumstances, (2) beyond his

---

decision of the state post-conviction court, the dispositive decision for federal habeas review, was not even part of the record before the district court. Moreover, I note that procedural decisions on limitations grounds typically occur early, and in considering equitable tolling an appellate court should take account of this, rather than assume that a district court will be able to undertake a full review in considering tolling. After all, it is the State's burden to file the state-court opinion, *not* the petitioner's, and a State need not file the state-court opinion until the State files its answer to the habeas petition in federal court. *See* Fed. R. Governing Section 2254 Cases 2, 5. Thus, if a State moves to dismiss on timeliness grounds before ever filing an answer, as North Carolina officials did here, the habeas court may well not have the state-court opinion in the record before it.

[2] The North Carolina Supreme Court denied certiorari on February 5, 1999. Rouse's petition would thus have been due on February 5, 2000. *See Hernandez v. Caldwell*, 225 F.3d 435, 439 (4th Cir. 2000). In 2000, however, February 5 was a Saturday. By application of Federal Rule of Civil Procedure 6(a), *see id.*, Rouse had until the next working day to file his petition. The petition was therefore due on Monday, February 7, 2000 — one day before Rouse filed it. Despite the magistrate judge's clear ruling on this point, *see* J.A. 320 (concluding that "the petition filed on February 8, 2000 was one day late"), which was undisturbed by the district court, the State — perhaps because of its unease with this fact — omits any mention of the length of the default in its brief. Nonetheless, it is clear, as the majority concedes, *ante* at 17-18, n.14; 22, that we confront today a first federal habeas petition that was just one day late.

29

control or external to his own conduct, (3) that prevented him from filing on time" in order to merit equitable tolling. *Ante* at 11. Apparently, in the majority's view, all that we have before us in this case is a "garden variety claim[ ] of excusable neglect." *Id.* Dismissing as irrelevant both the nature of Rouse's underlying claim and the fact that he faces a death sentence, the majority concludes that the district court properly refused to equitably toll the statute of limitations. *Id.* at 2, 18. I cannot agree.

As the majority properly acknowledges, *ante* at 11, we have recently joined every other circuit to consider the question to hold that the statute of limitations at issue here, 28 U.S.C.A. § 2244(d) (West Supp. 2003), is subject to equitable tolling. *See Harris v. Hutchinson*, 209 F.3d 325, 329-30 (4th Cir. 2000) (collecting cases); *see also Duncan v. Walker*, 533 U.S. 167, 121 S. Ct. 2120, 2129-30 (2001) (Stevens, J., joined by Souter, J., (concurring); *Greyhound Corp. v. Mt. Hood Stages, Inc.*, 437 U.S. 322, 338 n.* (1978) (Burger, C.J., concurring) ("The authority of a federal court, sitting as a chancellor, to toll a statute of limitations on equitable grounds is a well-established part of our jurisprudence." (citations omitted)). Thus, in appropriate cases, we clearly have the power to grant the relief Rouse seeks.

In making his case for such relief, Rouse maintains that his court-appointed lawyers "played Russian roulette with [his] rights" in waiting to file his petition, and that their "inexcusable" and "unconscionable" conduct provides grounds for equitable tolling of the statute of limitations in his case. Supplemental Brief of Appellant at 7. He notes that he has diligently pursued every previous avenue of review available to him. Moreover, the record reveals that Rouse personally neither knew of nor consented to a late filing of his federal habeas petition, and no evidence suggests that the late filing was a tactical decision of counsel.[3] Nor has the State made any showing that it has

---

[3] I agree that Rouse's health does not warrant tolling. Rouse's habeas lawyers were able to file his habeas petition on February 8, and Rouse provides no reason why his medical condition barred filing one day earlier. However, I note that Rouse's ability to monitor his *court-appointed* counsel, who, according to the majority, bound Rouse by their errors "not because he participated in, ratified, or condoned their decision, but because they were his agents," can hardly be considered normal under

30

been, or would be, prejudiced in any way by the one-day delay in the filing of Rouse's first habeas petition, and it is hard to imagine that such a showing could be made.

Nevertheless, if Rouse had offered only these reasons, our precedent might well have foreclosed equitable tolling, even in the face of the egregious attorney error at issue here. For we have held that "a mistake by a party's counsel in interpreting a statute of limitations does not present the extraordinary circumstance beyond the party's control where equity should step in to give the party the benefit of his erroneous understanding." *Harris*, 209 F.3d at 331; *see also Spencer v. Sutton*, 239 F.3d 626, 628-29 (4th Cir. 2001). But we reached this conclusion in cases involving greater delay, far less compelling habeas claims that had received at least one hearing, and petitioners who did not face execution, that irrevocable and "most . . . unfathomable of penalties." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (Marshall, J., writing on behalf of four justices).

In so holding, we also expressly recognized that equitable tolling is "`a discretionary doctrine that turns on the facts and circumstances of a particular case'" and, therefore, "`does not lend itself to bright-line rules.'" *Harris*, 209 F.3d at 330 (quoting *Fisher v. Johnson*, 174 F.3d 710, 713 (5th Cir. 1999)). As we explained, although some statutes of limitations "serve[ ] policy interests that would be adversely affected if the statutory limitations provisions were not strictly adhered to," the habeas context is different, warranting greater flexi-

---

any traditional understanding of "standard principles of agency." *See ante* at 15-16. As the State acknowledges, Rouse's mental ability, although one category "above mental retardation," was classified as "`borderline intellectual functioning.'" Supplemental Brief of Appellee at 3. Psychiatric evaluations revealed that during the 1980s and 1990s Rouse had an IQ of between 70 and 80, and that, due to a combination of "minimal brain dysfunction," "pediatric head injury," "a severely dysfunctional family," and "early substance abuse," he reached adulthood "with an extremely compromised psychological and neuropsychological functioning." *See* J.A. 193-201. These facts render it impossible to conclude that Rouse could meaningfully participate in an agency relationship with his lawyers, especially one concerning the bewildering complexity of the habeas corpus rules.

31

bility in the application of the AEDPA's statute of limitations. *Id.* at 329. Thus, in determining whether to exercise its equitable power to toll the statute of limitations, circuit precedent requires a court to consider the "facts and circumstances of a particular case." *Id.* at 330. Accordingly, I turn to that inquiry.

## III.

Few cases present "facts and circumstances" as compelling as this one. Not only did Rouse file his petition only one day late, but also his court-appointed counsel's disastrous error rested on plausible, albeit incorrect, legal theories, some of which have since been clarified. *See Fahy v. Horn*, 240 F.3d 239, 245 (3d Cir. 2001) (noting lack of clarity in the relevant law and plausibility of a petitioner's legal theory in equitably tolling the AEDPA), *cert. denied*, 534 U.S. 944 (2001). In addition, Rouse's mental shortcomings, *see supra* note 3, rendered his capacity to monitor his counsel marginal at best. And, Rouse has *never* received an evidentiary hearing on his habeas claims, in any forum — state or federal. *Cf. Spencer*, 239 F.3d at 627-28 (two evidentiary hearings in state court); Brief of Appellant in *Harris*, 209 F.3d 325 (evidentiary hearing in state court).[4] Without equitable toll-

---

[4] The state post-conviction court (the MAR court), whose ruling, of course, was not even before the district court, *see supra* n. 1, disposed of Rouse's claim, apparently on the basis of a *credibility determination* but *without a hearing*. After noting "that the acoustics in the courtroom where defendant was tried sometimes makes hearing difficult," the state MAR court concluded that the assertedly biased juror "did not hear" a question as to whether any juror had a relative who had been a victim of a violent crime. Yet the following facts contradict this conclusion: (1) the juror's admission that "I knew that if I disclosed what had happened to my mother, I would be excused from serving . . . I wanted to serve, . . . so I did not reveal the information"; (2) the state post-conviction court's acknowledgment of this admission; (3) the court's express finding (substantiated by the voir dire transcript) that *all* prospective jurors were asked if they had "been a victim of any kind of violent crime or any family members or any close relative ever been a victim of a violent crime"; (4) the court's further express finding that the transcript reflected no response to that question; and (5) the court's acknowledgment that immediately after the group question about family victims, prospective jurors were told that the trial "involv[ed] a first-degree murder, armed

32

ing, he will lose any hope of receiving such a hearing and will be afforded no federal habeas review at all.

Moreover, Rouse presents what must be considered on its face a powerful constitutional claim: that a juror's personal vengeance and racial bias infected his death sentence. To date, he has never been afforded an opportunity to explore the evidence that one of his jurors harbored an invidious prejudice against African-Americans, the evidence as to the potential effect of the sexual assault and murder of the juror's mother on his impartiality, or the evidence that in fact the juror intentionally concealed this bias — all matters that would seem to require credibility determinations. If proved, these facts support a strong constitutional claim. *See Morgan v. Illinois*, 504 U.S. 719, 728 (1992) (reviewing the "strictures dictated by the Sixth and Fourteenth Amendments to ensure the impartiality of any jury that will undertake capital sentencing" (emphasis omitted)); *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984); *Rosales-Lopez v. United States*, 451 U.S. 182, 190-91 (1981); *Irvin v. Dowd*, 366 U.S. 717 (1961).

Contrary to the majority's assertion, *ante* at 18-22, the strength of the claims in a habeas petition *must* inform a court's decision to exercise its equitable power to toll limitations at least in cases such as this one, where the evidentiary basis for such claims has never been subjected to judicial scrutiny. *See Lonchar v. Thomas*, 517 U.S. 314, 320 (1996) (emphasizing the distinction between habeas claims suitable for summary dismissal and those warranting more attention in revers-

---

robbery, and rape" (information the juror plainly took in, based on his knowledge of the nature of the trial and his resulting admitted desire to serve on the jury). State MAR Court, Post-Argument Supp. to Appellate Record, App. 3 at 3, 4, 15. Therefore, the state court apparently reached its dispositive finding, a credibility determination that contradicts the official written record of the voir dire, without the benefit of face-to-face consideration of any sort, without a hearing, and without even a direct assertion by the juror in support of the finding. Thus, the MAR court's "findings" would be due no deference even if they had been before the district court. *See* 28 U.S.C.A. § 2254(d)(2), (e)(1) (West Supp. 2003) (governing federal habeas review of state-court factual findings under AEDPA).

ing a lower court's employment of "special ad hoc`equitable' reasons not encompassed within the framework" of the Habeas Corpus Rules to bar all consideration of a first federal capital habeas petition); *see also Spencer*, 239 F.3d at 630 n. 2 (suggesting that petitioner's underlying habeas claim was weak when determining whether district court's tolling decision was correct).[5]

Indeed, a facially strong constitutional claim that questions the fundamental fairness of the very process by which a petitioner was convicted and sentenced "compels review regardless of procedural defaults." *Murray v. Carrier*, 477 U.S. 478, 501 n.8 (1986) (Stevens, J., concurring); *see also Hensley v. Mun. Court*, 411 U.S. 345, 349-50 (1973) ("[H]abeas corpus is not a static, narrow, formalistic remedy, but one which must retain the ability to cut through barriers of form and procedural mazes. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." (internal quotation marks and citations omitted)). We should remember, too, the limited relief that Rouse seeks: not that he be granted habeas relief, but merely that he be given the opportunity to explore before a federal district court his evidence of juror bias. I cannot join a decision that would allow the most minor procedural default imaginable to prohibit *all* evidentiary inquiry into such a serious constitutional claim. To deny the very possibility of habeas relief under such circumstances is to denigrate the power and purpose of the Great Writ. *See Carrier*, 477 U.S. at 500 (Stevens, J., concurring) ("[T]he central mission of the Great Writ should be the substance of `justice,' not the form of procedures."); *Brown v. Allen*, 344 U.S. 443, 553-54 (1953) (Black, J., dissenting) (embracing "the principle that it is never too late for courts in habeas corpus proceedings to look straight

_____

[5] There is nothing "circular, " *ante* at 20 n. 15, in taking into account the merits of a petitioner's claim when determining whether that claim deserves full consideration. *Cf. Miller-El v. Cockrell*, 537 U.S. 322, 123 S. Ct. 1029, 1039 (2003) and *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (following precisely this approach in determining whether a certificate of appealability should issue under 28 U.S.C.A. § 2253(c)). Clearly, if Rouse's underlying claims did not even facially allege the denial of a constitutional right, the district court's decision not to toll the statute of limitations would not be an issue.

34

through procedural screens in order to prevent forfeiture of life or liberty in flagrant defiance of the Constitution" (citations omitted)).

Rouse's call on our equitable powers is made all the more urgent by the fact that the sentence that is assertedly tainted by racial and personal bias is a death sentence. Until today, we have not had occasion to consider equitable tolling in a habeas case involving a sentence of death. *Cf. Spencer*, 239 F.3d at 627; *Harris*, 209 F.3d at 326. But we have implicitly recognized that the presence of a death sentence affects the equitable tolling analysis. *See Harris*, 209 F.3d at 329 (noting that although in some contexts, strict limitations rules may have to yield "occasional injustices . . . in order to maintain a workable regime," these "occasional injustices. . . are decidedly not an acceptable cost of doing business in death penalty cases" (quoting *Calderon v. United States Dist. Court for the Cent. Dist. Of Cal. (Beeler)*, 128 F.3d 1283, 1288 n.4 (9th Cir. 1997) (internal quotation marks and citations omitted), *overruled on other grounds*, 163 F.3d 530 (9th Cir. 1998) (en banc))).

The fact is that death is different. The phrase itself is timeworn and familiar — because it is true. Most of us, if we have lived long enough, have seen death. Each of us will face and know death one day. We share therefore in the understanding, though imperfect and incomplete, that "in its finality," death "differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion). For this reason, the death penalty presents different and far more serious concerns than any other sanction. *See, e.g., Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 2441 (2002) ("[T]here is no doubt that `[d]eath is different.'" (citation omitted)); *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion) (stating that "death is a different kind of punishment"); *see also Bracy v. Schomig*, 286 F.3d 406, 415 (7th Cir. 2002) (en banc) ("[W]e are again mindful that death is indeed different."), *cert. denied*, ___ U.S. ___, 123 S. Ct. 169 (2002). In short, the conclusion "that `death is different' . . . mean[s] that the firm view of our society demands that it be treated differently in certain identifiable respects. . . ." *Thompson v. Oklahoma*, 487 U.S. 815, 877-78 (1988) (Scalia, J., dissenting).

Accordingly, when we consider the deliberate infliction of death, even on someone who has wantonly dealt it out, we must act with par-

ticular care. As the Supreme Court has emphasized, "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination," that is, "the *procedure* by which the State imposes the death sentence," to "ensur[e] that the death penalty is not meted out arbitrarily or capriciously." *California v. Ramos*, 463 U.S. 992, 998-99 (1983) (emphasis in original) (footnote with citations omitted); *accord Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (opinion of Scalia, J., joined by Rehnquist, C.J.); *Caldwell v. Mississippi*, 472 U.S. 320, 329 (1985); *see also Bracy*, 286 F.3d at 412 ("[L]ike all others sentenced to death, Bracy and Collins are entitled to our painstaking review of their convictions and death sentence because, as the Supreme Court has often recognized, death is different." (citation omitted)).

Thus, the Supreme Court itself has, "'in the interests of justice'," been willing to overlook requirements that it would ordinarily impose in non-capital cases. *Eddings v. Oklahoma*, 455 U.S. 104, 117 n.* (1982) (O'Connor, J., concurring) (quoting *Wood v. Georgia*, 450 U.S. 261, 265 n.5 (1981)). For example, the Court has treated the requirement that an argument be raised below and in the certiorari petition, ordinarily prerequisites for Supreme Court review, as merely "technical[ ]." *Id.* (O'Connor, J., concurring in the Court's reversal of a death sentence (despite a dissenting argument that the ground for reversal had been waived) "[b]ecause the trial court's failure . . . risks erroneous imposition of the death sentence" (citation omitted)); *see id.* at 105, 113 n.9 (majority opinion) (reversing death sentence on basis of an argument habeas petitioner failed to raise below (prior to petition for rehearing) or even "expressly present" in his petition for certiorari, and citing *Wood*, 450 U.S. at 265 n.5, which notes that a court may overlook such failures "in the interests of justice"); *see also Dobbs v. Zant*, 506 U.S. 357, 360 (1993) (Scalia, J., concurring) ("I am willing to make an exception from that [previously stated `general' internal] rule in capital cases — but only where there is a realistic likelihood that the `technical error' affected the conviction *or the sentence*." (emphasis added)).

And, contrary to the majority's suggestion, *ante* at 22-24, the Court has not foreclosed the possibility that the fact of a death sentence should inform a court's consideration of a petitioner's underlying

36

claims in post-conviction proceedings. Although today we confront "only" a district court's decision on habeas review not to toll the statute of limitations, upholding that decision denies the possibility of *any* substantive judicial inquiry into the evidence underlying Rouse's juror bias claim. We cannot hide behind procedural rules when confronted with such circumstances.

Indeed, the Supreme Court has made clear that a reviewing court must exercise great care before allowing a capital petitioner's initial claim for federal habeas relief to be summarily dismissed. *See Lonchar*, 517 U.S. at 324 (noting in a capital case that "[d]ismissal of a *first* federal habeas petition is a particularly serious matter, for that dismissal denies the petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty" (emphasis in original) (citation omitted)). This is particularly so when, as here, the petitioner discovers the evidence underlying his claim *after* he has exhausted his direct appeal and without receiving any evidentiary hearing on the matter in state court. Sitting in equity to determine whether a federal limitations period should be tolled for a single day to afford a prisoner facing execution *any* federal habeas review, or any evidentiary hearing at all, we should follow the Supreme Court and recognize that the finality of death heightens our responsibility to ensure that the matter is disposed of "as law and justice require." 28 U.S.C.A. § 2243 (West 1994). "Given the irreversibility of capital punishment," a claim that does "not surface until after the direct review is complete, . . . deserves searching, adversarial scrutiny." *Murray v. Giarratano*, 492 U.S. 1, 24-25 (1989) (Stevens, J., dissenting). Because this is the posture in which Rouse's claim of juror bias reaches us, to confine even the possibility of habeas relief within rigid formalistic boundaries ties the hand of equity in a manner fundamentally at odds with our Nation's commitment to fair process.

A decision to toll the statute of limitations in this case, moreover, raises none of the concerns related to constitutional interpretation that are sometimes invoked in opposition to a "`death-is-different' jurisprudence," *Shafer v. South Carolina*, 532 U.S. 36, 55 (2001) (Scalia, J., dissenting); *see Simmons v. South Carolina*, 512 U.S. 154, 178-79 (1994) (Scalia, J., joined by Thomas, J., dissenting), and it would not alter the "`standard of review on federal habeas corpus,'" because AEDPA's stringent standards of review would of course still apply.

37

*Herrera v. Collins*, 506 U.S. 390, 405 (1993) (quoting *Giarratano*, 492 U.S. at 9 (plurality opinion)); *see* 28 U.S.C.A. § 2254(d), (e) (West Supp. 2003). Similarly, equitable tolling of this federal deadline poses no threat of intrusion on a state's enforcement of its own procedural rules, *cf. Coleman v. Thompson*, 501 U.S. 722 (1991), on a state's legislative choices, *cf. Giarratano*, 492 U.S. at 13-15 (O'Connor, J., concurring, and Kennedy, J., concurring in the judgment), or on the prerogatives of the executive branch. *Cf. Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 276, 284-85 (1998) (plurality opinion).

Nor is there any reason to fear that within our own circuit equitable tolling in Rouse's case might "loose the rule of law to whims about the adequacy of excuses, divergent responses to claims of hardship, and subjective notions of fair accommodation." *Harris*, 209 F.3d at 330. Of course, all non-capital petitions would continue to be governed by *Harris*. And even in capital cases, the precedential effect of tolling in this case would be slight. A deliberate decision to file late — to gamble any chance of federal review of a capital petitioner's habeas claims in hopes that equity would slightly extend the deadline — would constitute recklessness of a nature and a magnitude that an appellate court cannot consciously impute to its Bar. Even if such tactics were employed, equitable tolling is "a discretionary doctrine that turns on the facts and circumstances of a particular case," *id.* (internal quotation marks and citation omitted). Application of the doctrine would thus continue to depend on a court's confidence that "there is no evidence of abuse of the process." *See Fahy*, 240 F.3d at 245.

Until today, it appears that no appellate court has withheld all federal habeas review from a man under sentence of death, who presents evidence supporting a facially strong constitutional claim, but who filed his federal petition one day late.[6] In fact, other courts have tolled

---

[6] Although other courts have on occasion refused tolling in capital cases, they have done so in cases involving greater (typically much greater) delay, or when petitioners have shown less diligence than Rouse, or both. *See Fierro v. Cockrell*, 294 F.3d 674, 679-80 (5th Cir. 2002) (considering a habeas petition filed three months late), *cert. denied*, ___ U.S. ___, 123 S.Ct. 1621 (2003); *Lookingbill v. Cockrell*, 293 F.3d 256, 263-64 (5th Cir. 2002) (considering a habeas petition filed four days late

the very limitations period at issue here in cases involving more egregious delay. In a capital case involving a petition that was thirty-five days late due to attorney error in interpreting debatable procedural provisions, the Third Circuit tolled the precise statute at issue here. *See Fahy*, 240 F.3d at 245; *accord Banks v. Horn*, 271 F.3d 527, 534-35 (3d Cir. 2001) (applying equitable tolling in a capital case involving a petitioner convicted of murdering thirteen people), *rev'd on other grounds*, 536 U.S. 266 (2002). The *Fahy* court reasoned that a court "must allow less than `extraordinary' circumstances to trigger equitable tolling of the AEDPA's statute of limitations when a [capital] petitioner has been diligent in asserting his or her claims and rigid application of the statute would be unfair." *Fahy*, 240 F.3d at 245; *see also Corjasso v. Ayers*, 278 F.3d 874 (9th Cir. 2002) (tolling AEDPA's statute of limitations despite a procedural defect and listing cases); *Lagrone v. Cockrell*, 2002 WL 1968246, at *8-9 (N.D. Tex. Aug. 19, 2002); *De Jesus v. Miller*, 215 F. Supp. 2d 410, 412 (S.D.N.Y. 2002).[7]

Like the Third Circuit, I believe it is appropriate "to exercise this leniency under the facts of this capital case where there is no evidence of abuse of the process." *Fahy*, 240 F.3d at 245. Given that this case involves the shortest possible delay in filing a habeas petition, a total

---

and excused only by counsel's somewhat late appointment and "busy docket"); *Kreutzer v. Bowersox*, 231 F.3d 460, 461-62 (8th Cir. 2000) (considering a habeas petition filed two weeks late); *Cantu-Tzin v. Johnson*, 162 F.3d 295, 297-99 (5th Cir. 1998) (considering a case in which no habeas petition was ever filed and a motion for stay was filed two months after the deadline for a petition had passed). Regardless of diligence, however, I have found no case in which any circuit refused equitable tolling to a capital petitioner who filed his federal habeas petition one day late.

[7] No one quarrels with the AEDPA's intent to "reduce delays . . . and to further the principles of comity, finality and federalism." *Ante* at 11 (quoting *Woodford v. Garceau*, ___ U.S. ___, 123 S. Ct. 1398, 1401 (2003) (internal citation and quotation marks omitted). But allowing an execution to proceed without any exploration of the evidence that the conviction and sentence may be infected by racial bias renders the Great Writ a paper tiger and is fundamentally at odds with this nation's commitment to fair process and justice for all.

lack of prejudice to the State, a petitioner who, despite considerable mental shortcomings, has been diligent in all other regards, evidence of an apparently compelling constitutional claim that has never been explored by any court, and the fact of a death sentence, to refuse tolling here would be "unconscionable" and might well result in "gross injustice." *Harris*, 209 F.3d at 330. If ever a case was suitable for an exercise of a court's discretion — the most minor exercise imaginable, a one-day tolling of a limitations period — surely, this is that case.

## IV.

Today, a majority of this court allows the State of North Carolina to proceed with the execution of a man who may have been convicted and sentenced by a biased jury. When a court asks whether a petitioner in Rouse's position has a "special claim on equity," it should look to justice and conscience, calibrated by judicial experience. I believe that a pending death sentence must affect our exercise of conscience and our sense of justice.

Confronting the particular demands of capital cases, the Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that *the sentence was not imposed out of whim, passion, prejudice, or mistake*." *Eddings*, 455 U.S. at 118 (O'Connor, J., concurring) (emphasis added); *see also Gardner*, 430 U.S. at 358 (plurality opinion) ("It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion."). A strong showing that a death sentence may have been imposed out of pure bias should weigh more heavily with us than one day's non-prejudicial delay, and the vague risk, entirely within our control, that we ourselves will succumb to whim or prejudice in the future.

Less than twenty years ago, Justice Lewis Powell famously expressed his confidence that it is "unlikely indeed that a defendant today could go to his death with knowledge of undiscovered trial error that might set him free." *Ford*, 477 U.S. at 420 (Powell, J., concurring in part and in the judgment). By imposing a statute of limita-

40

tions on federal habeas petitions in the AEDPA, Congress struck a new balance, accepting a higher likelihood of such cases, and of cases in which undiscovered trial error had infected a sentence. Under the AEDPA, undoubtedly, some capital petitioners will be denied all federal habeas review for the sake of finality. But Congress did *not* eliminate our equitable power to toll the statute in the interest of justice.

As the majority suggests, the principles at issue in this case are indeed "large." *Ante* at 26. The Supreme Court has long recognized the writ of habeas corpus as the most powerful of equitable remedies, the "best and only sufficient defence of personal freedom." *Ex Parte Yerger*, 75 U.S. (8 Wall.) 85, 95 (1868). Thus,"[t]here is no higher duty of a court, under our constitutional system, than the . . . adjudication of petitions for writs of habeas corpus." *Harris v. Nelson*, 394 U.S. 286, 292 (1969). Yet, invoking principles of comity, finality, and federalism, the majority determines to deny any habeas relief to a petitioner under penalty of death who has filed his first federal habeas petition one day late. The majority believes that strict adherence to a statutory deadline must be maintained, even in the face of compelling new evidence of juror bias in a death penalty case, lest the future application of the AEDPA limitations period unravel into an "unpredictable and indeterminate" inquiry. *Ante* at 26. As explained above, such fears are baseless given the extraordinary facts of this case. Moreover, although comity, finality, and federalism are certainly important, no principle is more fundamental and no "duty of a court" is "higher," in "our constitutional system" than "adjudication of petitions for writs of habeas corpus, for it is in such petitions that a person in custody" can challenge his "unlawful confinement," *Nelson*, 394 U.S. at 292, and through such adjudication that courts ensure that the imposition of death by public authority occurs only after fair process.

Kenneth Rouse faces his death with reason to believe that one of the twelve citizens entrusted with doing impartial justice in his case sought so eagerly to condemn him that the juror deliberately misled the court, hiding basic facts as to his particular bias against Rouse and his contempt for all African Americans. If not in Rouse's interest then in the interest of justice, our court should not allow one day's delay to rob a man on death row of all federal habeas review of such a serious and troubling claim.

41

In keeping with the Supreme Court's teaching that capital cases *are* different, I would toll the statute of limitations in the rare circumstances presented in this case. Judge Michael, Judge King, and Judge Gregory join in this dissent.

42