**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JEFFREY DEAN FORD,
*Petitioner-Appellant,*

v.

FERNANDO GONZALEZ,
*Respondent-Appellee.*

No. 11-15430

D.C. No.
2:05-cv-00944-
LKK-GGH

OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Submitted March 12, 2012*
San Francisco, California

Filed July 2, 2012

Before: John T. Noonan, Jr., M. Margaret McKeown, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge Noonan

*The panel unanimously concludes this case is suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

## COUNSEL

Marylou Hillberg, Sebastopol, California, for the petitioner-appellant.

Kamala D. Harris, Michael P. Farrell, Brian G. Smiley, Jeffrey Grant, California Department of Justice, Sacramento, California, for the respondent-appellee.

## OPINION

M. SMITH, Circuit Judge:

Petitioner-Appellant Jeffrey Dean Ford (Ford), a California state prisoner, appeals from the district court's dismissal as untimely of three claims in his petition for a writ of habeas corpus, under 28 U.S.C. § 2254. Ford argues that his claims are timely because the prosecutor withheld evidence that Constance Goins (Goins), a witness for the prosecution at his trial, received lenient treatment in her own criminal cases in return

for testifying against him. We hold that Ford is not entitled to delayed commencement of the one-year statute of limitations under the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. §§ 2241 *et seq.*, because the factual predicate of his claims could have been discovered had he exercised due diligence at his trial. We also hold that Ford is not entitled to equitable tolling because he did not exercise reasonable diligence, and no extraordinary circumstance prevented the timely filing of his claims. Accordingly, we affirm the district court's dismissal of his habeas claims as time-barred.

## FACTUAL AND PROCEDURAL BACKGROUND

In September 2000, Detective Danny Minter (Detective Minter) of the Sacramento Sheriff's Department was investigating a series of bank robberies. Detective Minter met with Goins, who was in police custody on unrelated drug charges, at her request. She said that Ford had admitted to her that he was addicted to robbing banks and that he had robbed multiple U.S. Bank branches. Detective Minter told her that once he confirmed what she told him, he would contact the deputy district attorney prosecuting her case. Nevertheless, Goins was released from jail before the information she provided was confirmed. Detective Minter investigated what Goins told him and arrested Ford. Ford was charged with robbing six banks, including three U.S. Bank branches.

At Ford's trial, Goins testified for the prosecution. Witnesses offered different accounts about whether Goins had sought or received benefits for cooperating with law enforcement. Goins denied providing information to law enforcement to get out of jail. However, Detective Minter testified that Goins "said that she wanted to go home, and she had family members she needed to be home to take care of." He also testified that "she got out [of jail] right after we talked to her," although he denied having anything to do with her release. Throughout the closing argument, the prosecutor repeatedly

said that Goins spoke with Detective Minter because she wanted to be released.

After Ford was arrested, Beverly Ford, who is Goins's sister and Ford's wife, began living in the same house as Goins and their mother. During the trial, Beverly Ford pressured Goins to help Ford and took an active interest in Ford's case. Beverly Ford testified that a few weeks before trial, Goins was found in possession of drugs by a police detective, but was not arrested. During Ford's trial, the prosecutor reported to the court while Ford was present that a warrant was issued for Goins's arrest. Defense counsel asked the trial court whether he could use the information "to argue to this jury that [Goins] did what she did because she was expecting a deal from the DA's office," and gave an example of law enforcement taking "dope from her" but "cut[ting] her some slack." After the prosecutor reported that there was no deal by law enforcement to delay Goins's arrest warrant in exchange for her testimony and that the warrant was issued by a different judge because Goins had failed to appear on an unrelated court date, defense counsel did not pursue the issue.

The jury found Ford guilty of two counts of robbery. After the trial, Beverly Ford drafted a note in which Goins recanted her testimony, for Goins to copy. Beverly Ford then transported Goins to a notary so she could sign the note. Nevertheless, at a later hearing on Ford's motion for a new trial, despite Beverly Ford's insistence that she say otherwise, Goins maintained that she had been truthful at trial, and that her recantation in the notarized note was false. The California Court of Appeal affirmed Ford's convictions. On May 12, 2004, the California Supreme Court denied Ford's petition for review.

On May 13, 2005, Ford filed his original petition for a writ of habeas corpus in the United States District Court for the Eastern District of California, based on the introduction of certain evidence (unrelated to Goins's testimony) at his trial.

In November 2005, Ford's appointed counsel requested all of Goins's criminal files. Counsel received the files and reviewed them in January 2006. These files allegedly revealed that Goins had received favorable dispositions of her own criminal cases before and during Ford's trial.

On February 16, 2006, Ford filed an amended habeas petition seeking to add claims based on his counsel's examination of Goins's case files. The amended petition included the original grounds for relief in the first claim and added four new, unexhausted claims. In his second claim, Ford alleged that the prosecutor failed to disclose material, exculpatory evidence of benefits that Goins received for cooperating with law enforcement. The third claim stated that Ford's right to effective assistance of counsel was violated because his trial counsel failed to investigate favors Goins received in exchange for her testimony. Ford's fourth claim asserted that the prosecutor intentionally or recklessly introduced Goins's false, misleading, and perjurious testimony. The fifth claim contended that Ford's confinement was unlawful because of his actual innocence.

On August 23, 2006, the district court stayed and closed the case pending exhaustion of Ford's claims. The California Supreme Court denied Ford's state habeas petition on February 11, 2009.

On March 6, 2009, Ford notified the district court of the California Supreme Court's decision and requested that the court lift the stay. The same day, Ford filed a second amended petition that included the same claims as the first petition, but included additional facts in support of Ford's fifth claim.

On March 17, 2009, the magistrate judge lifted the stay. Respondent-Appellee Fernando Gonzalez moved to dismiss claims 2 through 5 as time-barred. The district judge adopted the magistrate judge's recommendation as to claims 2, 3, and

4, and dismissed these claims as untimely. In the same order, the district judge dismissed claim 5 on the merits.

After the district judge dismissed Ford's remaining habeas claim, Ford filed a timely notice of appeal to our court. *See* Fed. R. App. P. 4(a)(5)(A).

## STANDARD OF REVIEW AND JURISDICTION

"The dismissal of a petition for writ of habeas corpus as time-barred is reviewed de novo." *Bills v. Clark*, 628 F.3d 1092, 1096 (9th Cir. 2010) (quoting *Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003)). "If the facts underlying a claim for equitable tolling are undisputed, the question of whether the statute of limitations should be equitably tolled is also reviewed de novo." *Id.* (quoting *Spitsyn*, 345 F.3d at 799). "Otherwise, findings of fact made by the district court are to be reviewed for clear error." *Id.* (quoting *Spitsyn*, 345 F.3d at 799).

We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(c).

## DISCUSSION

Under AEDPA, "[a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). "Section 2244(d)(1) 'contain[s] multiple provisions relating to the events that *trigger* its running.' " *Lee v. Lampert*, 653 F.3d 929, 933 (9th Cir. 2011) (en banc) (quoting *Holland v. Florida*, 130 S. Ct. 2549, 2561 (2010)) (alteration in original). "The triggering events are the dates on which: direct review becomes final, an unlawful state-created impediment to filing is removed, a new constitutional right is made retroactively available, or the factual predicate of the claim(s) presented could have been discovered with 'due diligence.' " *Id.* (quoting 28 U.S.C. § 2244(d)(1)(A)-(D)). The

one-year statute of limitations begins running from the latest of those dates. *See* 28 U.S.C. § 2244(d)(1); *Hasan v. Galaza*, 254 F.3d 1150, 1153 (9th Cir. 2001). Equitable tolling may also apply in appropriate circumstances. *See Holland*, 130 S. Ct. at 2554.

On appeal, Ford challenges the dismissal of claims 2, 3, and 4 as untimely. He argues that he is entitled to delayed commencement of the statute of limitations because the factual predicate of his claims could not have been discovered until his present counsel received Goins's case files in January 2006.[1] He also argues that he is entitled to equitable tolling.

## A. Start Date of Statute of Limitations

[1] The statute of limitations begins to run under § 2244(d)(1)(D) when the factual predicate of a claim "could have been discovered through the exercise of due diligence," not when it actually was discovered. 28 U.S.C. § 2244(d)(1)(D) (emphasis added); *accord Schlueter v. Varner*, 384 F.3d 69, 74 (3d Cir. 2004). "Due diligence does not require 'the maximum feasible diligence,' but it does require reasonable diligence in the circumstances."[2] *Schlueter*, 384 F.3d at 74 (quoting *Moore v. Knight*, 368 F.3d 936, 940 (7th Cir. 2004)); *see also Quezada v. Schribner*, 611 F.3d 1165, 1168 (9th Cir. 2010) (using reasonable diligence standard in evaluating commencement of statute of limitations under § 2244(d)(1)(D)); *Starns v. Andrews*, 524 F.3d 612, 619

---

[1]Ford abandoned any argument that the failure to disclose Goins's case files was a state-created impediment that delayed the start of the statute of limitations under 28 U.S.C. § 2244(d)(1)(B).

[2]We seem to have reached this conclusion only in an opinion subsequently vacated for unrelated reasons, and we reach this conclusion again today. *See Souliotes v. Evans*, 622 F.3d 1173, 1178 (9th Cir. 2010) ("As our sister circuits have recognized, § 2244(d)(1)(D) does not demand the maximum diligence possible, but only 'due' or 'reasonable' diligence."), *vacated*, 654 F.3d 902 (9th Cir. 2011).

(5th Cir. 2008); *DiCenzi v. Rose*, 452 F.3d 465, 470 (6th Cir. 2006) (noting that § 2244(d)(1)(D) requires only due, or reasonable, diligence).

**[2]** "Section 2244(d)(1)(D) provides a petitioner with a later accrual date than section 2244(d)(1)(A) only 'if vital facts could not have been known' " by the date the appellate process ended. *Schlueter*, 384 F.3d at 74 *(quoting Owens v. Boyd*, 235 F.3d 356, 359 (7th Cir. 2000)). The "due diligence" clock starts ticking when a person knows or through diligence could discover the vital facts, regardless of when their legal significance is actually discovered. *See Hasan*, 254 F.3d at 1154 n.3; *see also Redd v. McGrath*, 343 F.3d 1077, 1082 (9th Cir. 2003).

**[3]** Although section 2244(d)(1)(D)'s due diligence requirement is an objective standard, a court also considers the petitioner's particular circumstances. *See Wood v. Spencer*, 487 F.3d 1, 5 (1st Cir. 2007) (holding that due diligence under § 2244(d)(1)(D) is an objective test); *Schlueter*, 384 F.3d at 75 (considering petitioner's physical confinement and familial assistance in determining due diligence); *Moore*, 368 F.3d at 940 (taking into account that prisoners are limited by their physical confinement in determining due diligence); *Easterwood v. Champion*, 213 F.3d 1321, 1323 (10th Cir. 2000) (holding that a case is "discoverable" by "due diligence" on the date it becomes accessible in the prison law library, rather than the date of publication); *see also Starns*, 524 F.3d at 619 (holding that a petitioner did not fail to act with due diligence given the state's misleading suggestion). Just as the petitioner's particular circumstances may include impediments to discovering the factual predicate of a claim, they may also include any unique resources at the petitioner's disposal to discover his or her claim. *See, e.g.*, *Schlueter*, 384 F.3d at 75 (considering that a petitioner's parents actively assisted him in evaluating his diligence).

Here, Ford's second, third, and fourth claims are premised on an alleged deal Goins received for testifying against him

and providing information to the police. The only evidence Ford offers that such a deal exists is Goins's case files, which allegedly show favorable dispositions of some charges against her.

[4] We hold that the factual predicate of Ford's claims could have been discovered at the time of his trial through the exercise of due diligence. The magistrate judge observed that Ford "relies on a factual predicate and speculative inferences therefrom which have been present since the trial itself (whether or not they were recognized by anyone)." We agree.

[5] Based on the testimony offered at Ford's trial, Ford had reason to suspect that Goins may have sought and received some benefits for assisting law enforcement. At the very least, Ford and his trial counsel were aware that, despite being found in possession of drugs by a police detective, Goins was not arrested. In fact, his trial counsel remarked at trial that he wanted to argue to the jury that Goins "did what she did because she was expecting a deal from the DA's office," but declined to press this argument. Thus, Ford's trial counsel was clearly aware of the possibility of a deal. Regardless of whether this knowledge is attributed to Ford, it illustrates that the testimony at trial gave ample reason for a reasonable person in Ford's position to investigate further whether Goins sought and received benefits in return for assisting law enforcement. *Cf. Wood*, 487 F.3d at 4-5 (holding that a petitioner, through his attorney, had notice of a conversation in evaluating whether the petitioner exercised due diligence under § 2244(d)(1)(D)).

[6] Beyond the testimony at trial, the unique living arrangements and active assistance of Beverly Ford, his wife, also gave Ford access to information about whether Goins had received a deal. Beverly Ford, Goins's sister, lived in the same house as Goins and their mother. As the magistrate judge found, "it is more than arguable that Beverly Ford was present and aware of Goins' various criminal cases and their

dispositions" after Ford's arrest. During and after the trial, Beverly Ford pressured Goins to help Ford, and took an active interest in Ford's case. The magistrate judge did not speculate as to what specific information Beverly Ford was privy to or what information she relayed to Ford. Beverly Ford's assistance was an additional resource a reasonable person in Ford's circumstances could have used to discover the factual predicate of his claims at the time of his trial. *See, e.g.*, *Schlueter*, 384 F.3d at 75 (considering that a petitioner's parents, who were actively involved in his case, could have assisted the petitioner in discovering the factual basis of his habeas claim).

**[7]** Under the circumstances, Ford could have discovered the factual predicate of claims 2, 3, and 4 through the exercise of due diligence, no later than the completion of his trial. Thus, the district court did not err in finding that Ford did not exercise due diligence. Accordingly, the statute of limitations began running under § 2244(d)(1)(D) no later than the end of Ford's trial. *See Schlueter*, 384 F.3d at 74.

**[8]** Because the vital facts underlying claims 2, 3, and 4 could have been known long before the state appellate process ended, § 2244(d)(1)(D) does not provide Ford with a later accrual date than § 2244(d)(1)(A). *See id.*; *Owens*, 235 F.3d at 359. Accordingly, the one-year statute of limitations began running on August 11, 2004, the day after Ford's conviction became final and the latest of the possible triggering dates. *See* 28 U.S.C. § 2244(d)(1); *Corjasso v. Ayers*, 278 F.3d 874, 877 (9th Cir. 2002). Ford first asserted claims 2, 3, and 4 on February 16, 2006, long after the statute of limitations expired.[3]

---

[3]"[A] new claim in an amended petition relates back to avoid a limitations bar, when the limitations period has run in the meantime, only when it arises from the same core of operative facts as a claim contained in the original petition." *Hebner v. McGrath*, 543 F.3d 1133, 1134 (9th Cir. 2008). However, Ford does not argue that claims 2, 3, and 4 are timely under the relation back doctrine. Even if he did, his new claims would not relate back to his original petition because they arise from an entirely different set of operative facts. *See id.*

Therefore, the district court did not err in concluding that claims 2, 3, and 4 were time-barred.[4]

## B.   Equitable Tolling

Ford argues that he is entitled to equitable tolling because the prosecutor withheld evidence that Goins had received a deal. As an initial matter, we note that claims 2, 3, and 4 are premised on the assumption that Goins received lenient treatment in cases against her for helping law enforcement convict Ford. Ford offers no evidence in support of this assumption other than the allegedly favorable dispositions reflected in Goins's case files. He also seems to concede that these case files are matters of public record.

"[A] 'petitioner' is 'entitled to equitable tolling' only if he shows '(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and prevented timely filing." *Holland*, 130 S. Ct. at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). "The diligence required for equitable tolling purposes is 'reasonable diligence,' not 'maximum feasible diligence.' " *Id.* at 2565.

**[9]** The "general rule" is that "equitable tolling is available where the prisoner can show extraordinary circumstances were the cause of an untimely filing." *Bills*, 628 F.3d at 1097. "Under our cases, equitable tolling is available for this reason only when extraordinary circumstances beyond a prisoner's control make it *impossible* to file a petition on time and the extraordinary circumstances were the *cause* of [the prisoner's] untimeliness." *Id.* (quoting *Spitsyn*, 345 F.3d at 799) (internal quotation marks omitted).

---

[4]The fact that Ford filed a habeas petition in state court after AEDPA's statute of limitations expired does not affect our conclusion. *See Ferguson v. Palmateer*, 321 F.3d 820, 823 (9th Cir. 2003) (holding that "section 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed").

Here, Ford did not pursue his rights diligently. The testimony at his trial, as well as the unique living arrangements and active assistance of Beverly Ford, gave Ford ample reason to suspect that Goins may have sought and received benefits. The fact that Goins's case files were matters of public record also indicates Ford's lack of diligence.

**[10]** Ford essentially argues that he is entitled to equitable tolling merely because he alleges that the prosecutor violated *Brady v. Maryland*, 373 U.S. 83 (1963). If Ford were correct, AEDPA's one-year statute of limitations could never bar a *Brady* claim. Several of our sister circuits have found *Brady* claims time-barred, and we agree that the statute of limitations may bar such claims in appropriate circumstances. *See, e.g.*, *Daniels v. Uchtman*, 421 F.3d 490, 492 (7th Cir. 2005) (noting that information supporting petitioner's *Brady* claim could have been discovered more than one year prior to petitioner's filing of his federal habeas petition); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111, 113 (2d Cir. 2000) (dismissing *Brady* claim as time-barred where petition was filed almost two years after the petitioner obtained the exculpatory materials). Thus, we reject Ford's argument.

The dissent's arguments are similarly flawed. Through circular logic, our dissenting colleague contends that because the prosecution violated *Brady*, we may reach the merits of Ford's *Brady* claim. *But see Rouse v. Lee*, 339 F.3d 238, 252 n.15 (4th Cir. 2003) (en banc) ("It seems curiously circular to say . . . that we consider the merits in deciding whether we can consider the merits."). Our colleague also argues that we are requiring a defendant's spouse to help a defendant. Neither of the dissent's claims is correct.[5]

---

[5]We do not share the dissent's certainty that a *Brady* violation occurred, given the unique facts of this case. Several of our sister circuits have suggested that *Brady* is not violated when a government witness merely desires or expects favorable treatment in return for his or her assistance, and no evidence of an agreement between the government and the witness

The narrow issue before us is whether Ford's habeas claims are time-barred. Under AEDPA, this is a threshold question that we must decide *before* we reach the merits of a habeas petitioner's claims. *See, e.g.*, *Miranda v. Castro*, 292 F.3d 1063, 1068 (9th Cir. 2002) (affirming the dismissal of a habeas petition as untimely without reaching the merits of its claims). Because Ford did not exercise due diligence and no extraordinary circumstance prevented the timely filing of his claims, his claims are time-barred regardless of their strength. Unlike our dissenting colleague, we decline to take the circular approach of considering the merits of Ford's claims in evaluating whether they are timely enough to reach the merits.

Contrary to the dissent's characterization, we do not impose any affirmative requirement on a defendant's *spouse* in evaluating the timeliness of a habeas claim. Our focus before we may reach the merits is simply whether the *petitioner* exercised reasonable diligence given his particular circumstances, including any impediments confronting him and the resources at his disposal. Our colleague's approach implies that we should ignore the resources at a petitioner's disposal, and take into account only the impediments con-

---

is presented. *See, e.g.*, *Shabazz v. Artuz*, 336 F.3d 154, 165 (2d Cir. 2003); *Todd v. Schomig*, 283 F.3d 842, 849 (7th Cir. 2002); *see also Bell v. Bell*, 512 F.3d 223, 234 (6th Cir. 2008) (en banc). Although we need not decide whether to join our sister circuits, their precedents raise considerable doubt that a *Brady* violation occurred in this case. Our doubt is further reinforced by Ford's access to information suggesting that Goins may have sought and received benefits in return for helping law enforcement. *See United States v. Aichele*, 941 F.2d 761, 764 (9th Cir. 1991) ("When, as here, a defendant has enough information to be able to ascertain the supposed *Brady* material on his own, there is no suppression by the government."); *United States v. Shaffer*, 789 F.2d 682, 690 (9th Cir. 1986) (agreeing with the government that a defendant "cannot claim a *Brady* violation if he was 'aware of the essential facts enabling him to take advantage of any exculpatory evidence' "). Nevertheless, we need not decide whether a *Brady* violation occurred in this case, and we decline to do so.

fronting him, in evaluating diligence. The Third Circuit has rejected such an approach, and so do we. *See Schlueter*, 384 F.3d at 75 (considering that a petitioner's parents actively assisted him in evaluating his diligence).

As sympathetic as the dissent portrays Ford to be, sympathy alone neither delays the start date of AEDPA's statute of limitations nor constitutes an equitable exception. AEDPA is designed "to 'further the principles of comity, finality, and federalism.'" *Panetti v. Quarterman*, 551 U.S. 930, 945 (2007) (citation omitted). We decline the dissent's well-meaning, but misguided, invitation to disregard those principles.

**[11]** Under the circumstances, Ford did not pursue his rights diligently. He did not exercise reasonable diligence in obtaining Goins's case files, his only evidence of the existence of a deal. Even if Ford had been diligent, no extraordinary circumstance prevented the timely filing of claims 2, 3, and 4. Therefore, the district court did not err in concluding that Ford is not entitled to equitable tolling. *See Holland*, 130 S. Ct. at 2562.

## CONCLUSION

For the foregoing reasons, we affirm the district court.

**AFFIRMED.**

---

NOONAN, Circuit Judge, dissenting:

The majority forbids a federal court from hearing Ford's habeas petition on the merits, not because the government in Ford's case did not violate *Brady*, but because Ford, a prisoner at the time, should have, with due diligence and the help of his wife Beverly, been able to discover the government's

breach of *Brady*. The majority excuses the government's lapse while it imposes a new requirement on the spouse of a defendant.

Constance Goins was the prosecution's principal witness against Ford. In the lead-up to Ford's trial, the government averred that it knew nothing of an April, 2002 case against Goins for a violation of her probation. It further averred that the status of that case had "no connection" to her testimony in Ford's case. The government put Goins on the stand at Ford's trial and elicited testimony from her that she did not inculpate Ford in order to get out of jail. Any listener would have inferred from her statement that she did not receive favorable treatment in the disposition of her case as a result of her cooperation. The detective who interviewed her in jail testified that the police might have helped her by talking to the district attorney in her case, had she not posted bail herself before they had the chance. The inference was that they had not helped her out at all in resolving her criminal cases. The government's in limine assertions and the testimony of the two state's witnesses conveyed that Ms. Goins had not been afforded favorable treatment by the prosecution in her own criminal cases in exchange for her testimony against Ford. Ford's attorney did not independently investigate.

In fact, only after Ford was appointed habeas counsel by the district court in 2005 did the extent of Ms. Goins' criminal history — and the apparent favorable treatment she had received — surface. Habeas counsel discovered, by ordering copies of Goins' criminal case files from the Sacramento Superior and Municipal Courts, the following:

> After Goins' September 11, 2000 statement to the detective, her bail was reduced to $8000 and she was released on bail;

> One week later, the court sentencing her found unusual circumstances to justify a sentence of probation in that felony case, F07258;

> In three separate felony probation cases, the trial court added as a condition of probation that she was to comply with any and all subpoena orders;

> While Ford's case was being prepared for trial, Goins was arrested again and held to answer for assaulting a woman with a deadly weapon; just before Ford's trial, the case against her was dismissed on a motion by the district attorney.

Goins had an active criminal history from the time she summoned the detectives to meet her in jail on September 11, 2000 up to the time of Ford's trial in April, 2002. From all appearances, her testimony against Ford seems to have led to extremely favorable dispositions in at least the felony drug case and the assault with a deadly weapon case. The government provided none of this information to Ford, either before securing his conviction or after. It averred only that there was "no connection" between the disposition in her parole violation case and her testimony against Ford. It elicited testimony from two witnesses suggesting that she was not given favorable prosecutorial treatment. This impression seems to have been misleading.

A.   *The prosecution violated Brady.*

The prosecution has the obligation to turn over evidence favorable to an accused: "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland,* 373 U.S. 83, 87 (1963). The Court went on to hold, in *Giglio*, "When the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule [of *Brady*]." *Giglio v. U.S.*, 405 U.S. 150, 154 (1972) (citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959)). Considering precisely the issue of the motive of a

prosecution's witness to inculpate the defendant, the Court reversed Giglio's conviction:

> Here the Government's case depended almost entirely on Taliento's testimony; without it there could have been no indictment and no evidence to carry the case to the jury. Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it.

*Giglio*, 405 U.S. at 154-55.

"Whether the nondisclosure was a result of negligence or design, it is the responsibility of the prosecutor. The prosecutor's office is an entity and as such it is the spokesman for the Government. A promise made by one attorney must be attributed, for these purposes, to the Government." *Giglio*, 405 U.S. at 154. This court has repeatedly so held. *See, e.g., Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1995) (en banc) ("Because the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned"); *U.S. v. Zuno-Arce*, 44 F.3d 1420, 1427 (9th Cir. 1995) (exculpatory information in the possession of the FBI covered under *Brady*). It is also clear that the prosecution is required to turn over evidence favorable to the defense whether or not the defense requests the information. *See U.S. v. Bagley*, 473 U.S. 667, 682-83 (1985); *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

Ford raises evidence that Goins averted incarceration on more than one occasion in the wake of her cooperation against Ford. The prosecution either knew about the dispositions of Goins' criminal cases or is presumed, for *Brady* purposes, to have known. The prosecution was required to provide this information to Ford.

B.   *The statute of limitations began to run when Ford dis-
     covered the facts underlying the Brady claim.*

AEDPA's one-year statute of limitations runs from "the
date on which the factual predicate of the claim or claims
presented could have been discovered through the exercise of
due diligence." 28 U.S.C. § 2244(d)(1)(D). What due dili-
gence must a petitioner show when a state's failure to disclose
*Brady* material leads to a delay in discovering the evidence?
Here, the one-year limitations period commenced when
Ford's counsel received Goins' criminal conviction histories.

The Supreme Court in *Strickler v. Greene* held that a
habeas petitioner had shown cause to excuse a procedural
default where he had no reason to believe at the time of trial
that the state had withheld *Brady* evidence. 527 U.S. 263,
287, 289 (1999). He was entitled to rely on the state's duty to
disclose. *Id.* Similarly, Ford had no reason to believe at the
time of trial that the government had withheld evidence
whose disclosure was required by *Brady*.

Circuit courts that have confronted this question in the stat-
ute of limitations context have held implicitly that the statute
of limitations begins to run at the time the petitioner discovers
the *Brady* material. *See, e.g., Friedman v. Rehal*, 618 F.3d
142, 152 (2d Cir. 2010) (limitations period began to run when
petitioner saw the film *Capturing the Friedmans* and thereby
discovered that the prosecution had used hypnosis to help the
complainants remember); *Starns v. Andrews*, 524 F.3d 612,
619 (5th Cir. 2008) (limitations period began to run when a
witness gave exculpatory testimony in a subsequent wrongful
death action, where the defendant assumed "the state could be
taken at its word" when it turned over the witness' name
before trial but indicated that he would only be marginally
helpful); *Daniels v. Uchtman*, 421 F.3d 490, 491-92 (7th Cir.
2005) (limitations period began to run in petitioner's *Brady*
claim when a witness executed an affidavit recanting his testi-
mony); *Slutzker v. Johnson,* 393 F.3d 373, 382 (3d Cir. 2004)

(statute of limitations on *Brady* claim began to run when habeas petitioner received previously undisclosed police reports).

Our circuit is equally clear. In *Quezada v. Scribner*, 611 F.3d 1165, 1166-67 (9th Cir. 2010), the prosecution suppressed evidence of the compensation that Aflague, its witness, received in exchange for his cooperation against Quezada. The prosecutor represented to the court that Aflague received no benefits in exchange for his testimony. *Id.* at 1167. However, it later surfaced that Aflague had received between $9,000 and $25,000 for his cooperation with law enforcement over the course of a decade in various cases. *Id.* Aflague also declared that he had lied about compensation in a different case. *Id.* Considering the one-year statute of limitations, we reasoned:

> Quezada requested compensation information from the court, from the government and from Aflague. Quezada's attempts to acquire this information were repeatedly rebuffed by silence on the part of the informant, or an outright denial of the existence of missing compensation information by the government. On December 11, 2008, Aflague changed his testimony. Quezada discovered this in the spring of 2009. On the record before us it is clear that Quezada did exercise reasonable diligence yet was unable to acquire this information earlier.

*Id.* at 1168.

This case is analogous. Ford's counsel moved in limine to either obtain information about Goins' criminal history or to use her convictions for impeachment purposes. When the government averred that any disposition of her probation case was unconnected to Ford's case, Ford's attorney accepted the government's statement. Ford was entitled to rely on the government's statement and its abiding obligation to comply with

*Brady. See Strickler v. Greene*, 527 U.S. at 289; *Bagley*, 473 U.S. at 682-83.

As an inmate, Ford had neither the knowledge of the relevant case numbers nor the funds with which to gain access to the records of Goins' criminal history. But the district court and this court endorse the magistrate's surprising finding that " 'it is more than arguable that *Beverly* Ford was present and aware of Goins' various criminal cases and their dispositions' after Ford's arrest." Maj. op. at 7763-64 (emphasis added). It is now not the state but the spouse who is in "the unique" position to supply *Brady* information. *See id.* This imaginative supposition is a bold circumvention of *Brady*. The only party that bore the constitutional obligation to provide Ford with this information was the *government* — not Ford, not Goins, and certainly not Beverly Ford.

In the cases relied on by the majority, knowledge of the *Brady* violation was timely possessed by the habeas petitioner within the one-year limitations period and the government did not keep him in ignorance by denying the *Brady* violation. *See, e.g., Lucidore v. New York State Division of Parole*, 209 F.3d 107, 110-11, 113 (2d Cir. 2000) (petitioner conceded that he knew facts of *Brady* violation in April, 1997 but filed his petition on April 22, 1999); *Daniels v. Uchtman*, 421 F.3d at 492 (factual predicate for timeliness purposes was date the prosecution's witness executed affidavit recanting trial testimony). These cases do not appear to be binding or even relevant when the petitioner has been misled by denials of the *Brady* violation by the state.

The rule of law is subverted when the state violates an important constitutional norm and then attempts to minimize the harm it has done. Contrary to constitutional law established by the United States Supreme Court, this panel of the Ninth Circuit excuses a flagrant violation of *Brady* by imposing upon the *wife* of an incarcerated defendant the obligation

of detecting the state's breach of *Brady* within the statutory limitations period.